# IN THE UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF TEXAS

# DALLAS DIVISION

**JAMES DE LOS SANTOS,**

   Plaintiff,

v.           CIVIL ACTION NO. 3:26-cv-00122-K-BK

**CHARLES EDWIN SHOFFNER**, individually;

**SHERWOOD SOUTHWEST, LLC**;

**CVB INC.**, a Utah corporation, f/k/a and/or

d/b/a CVBUT Inc. and Malouf Companies; and

**WEST CREEK FINANCIAL, INC.**, a Virginia

corporation, d/b/a Koalafi,

   Defendants.

---

# FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES

---

## EVIDENTIARY FOUNDATION

On March 5, 2025, while Plaintiff was still operating within Defendants' controlled onboarding phase and before any termination or retaliation, Plaintiff raised the core claims now asserted in

1

this action directly with Defendant Charles Edwin Shoffner and his executive leadership in a non-accusatory, factual effort to resolve the matter without court intervention. Plaintiff identified material legal and operational concerns—including franchise-level control, exclusive dealing mandates, restraints on independent sourcing, and termination threats that had been communicated verbally—framing the inquiry as an effort to preserve and strengthen what had been marketed as a legitimate independent business opportunity formed only months earlier, a business opportunity Plaintiff now alleges was tainted by Defendant Shoffner's hidden and undisclosed past.

In that correspondence, Plaintiff expressly disclaimed any adversarial intent and instead presented the issues as risks to the enterprise itself, including potential violations of federal franchise law, the Texas Deceptive Trade Practices Act, and antitrust restraints of trade. Plaintiff sought confirmation of whether the verbal restrictions and threats he had received reflected actual company policy, emphasizing that the absence of clarity directly affected his ability to operate lawfully, plan finances, and protect a substantial investment. Rather than engage on the substance of these concerns, Defendant Shoffner's Chief Sales Officer, Keith Mackey, speaking on behalf of in-house counsel, refused to provide written clarification, instructing Plaintiff:

> "Regarding your recent emails to our in-house counsel, Dave Shiroff, please note that he will not be responding. He asked me to convey to you that he acknowledges receipt of your email, as well as its content, but believes it would not serve the interests of MBA to engage in legal correspondence with you at this time." **(Ex. A, p. 5)**.

This was not inadvertent. It reflects a deliberate strategy to enforce restrictive practices while avoiding the creation of a discoverable record.

Plaintiff has compiled an extensive evidentiary record spanning 2009 through 2024, consisting of hundreds of exhibits documenting Defendants' fraudulent and anticompetitive conduct. The record includes prior judicial findings, regulatory admissions executed personally by Defendant Shoffner, sworn testimony, financial records, and internal communications demonstrating a coordinated system of control, concealment, and retaliation. This is not a business dispute. It is a case concerning illegal restraints of trade, systematic fraud, and a multi-defendant conspiracy

2

whose structure and effects are now fully documented. Plaintiff stands ready to present this evidence.

## NATURE OF THE ACTION

1.    This is an action for damages arising from a thirteen-year unlawful and fraudulent enterprise orchestrated by Defendant Charles Edwin Shoffner and implemented through conspiracy with corporate co-conspirators Sherwood Southwest, LLC, CVB Inc. (operating as Malouf Companies), and West Creek Financial, Inc. d/b/a Koalafi. Defendant Shoffner built this enterprise upon a stolen trade secret system adjudicated by Ohio courts in 2009 **(Ex. G)**, concealed the theft through judicial perjury in 2015 **(Ex. I, F)**, personally executed a 2019 Washington State Consent Order resolving regulatory findings of Business Opportunity Fraud Act violations **(Ex. D)**, and has perpetuated the scheme through systematic fraud and anticompetitive restraints of trade in violation of federal and state law.

2.    **Plaintiff is not a repeat franchise investor or sophisticated institutional actor, but a sole custodial parent for whom the promise of flexible, legitimate self-employment was a non-negotiable requirement—a target Defendant Shoffner specifically designed his deceptive advertising to exploit.** He is the sole parent and provider for his four-year-old daughter, her mother having been absent since birth. Defendants' specific advertising promises—"be your own boss," "set your own hours," "work part-time," "earn up to $150,000"—were materially designed to target individuals like Plaintiff: sole custodial parents for whom a flexible, legitimate path to self-employment was a non-negotiable requirement to fulfill parental responsibilities while earning a living. Plaintiff expressly communicated this reality to Defendants' agents during recruitment. Defendants, however, operated a system designed for high turnover, not sustainable partnership. As sworn to by Defendant Shoffner's own former partner, Darren Conrad, Shoffner "knew about the company's business model at the time he became an owner" and knew it was built upon a misappropriated sales system **(Ex. V, ¶ 34)**. Conrad admitted under oath that he "created a 'playbook'" that "largely copied the system I developed at PMD" and that Shoffner's enterprise continued using this stolen system to

recruit and train dealers nationwide **(Ex. V, ¶¶ 7–8, 10, 31)**. That model produced over 65% dealer attrition—190 of 289 dealers departed between January 2012 and September 2014 alone **(Ex. J)**. Shoffner himself admitted he personally worked with Conrad to "adjust" this playbook as a "fluid document" and created the fraudulent pricing spreadsheets used to control dealer profitability **(Ex. F, J)**. Defendants' post-contractual admission—through Head of Coaching Katie Hein—that the role was "hard" and that most recruits "only have $20K to invest" and are "forced to work hard to make it work no matter what," confirms they knowingly recruited Plaintiff into this high-attrition system, fundamentally incompatible with the flexible entrepreneurship promised to a sole custodial parent. Plaintiff invested in good faith based on a promise of compatible independence; instead, he was converted into a short-term revenue source in a documented churn model, generating guaranteed profits for Defendants' designated suppliers while bearing all risk, and is now fighting to prevent the loss of his home and livelihood.

3.   The fraud operated as follows: Defendants advertised a turnkey mattress business through social media marketing promising independence, flexibility, and substantial income **(Ex. DD)**. These advertisements contained material misrepresentations about product quality, pricing, and business viability—misrepresentations that cost prospective customers $100 to $400 per transaction but cost Plaintiff everything. Defendants concealed the dealer agreement until after Plaintiff had committed approximately $91,000 in lease obligations and inventory deposits, ensuring he could not review the arbitration clause, non-compete, or other restrictive terms before his capital was irretrievably committed **(Ex. Y, Z, BB)**. Once Plaintiff had been irreversibly financially committed through Defendants' sequencing, Plaintiff discovered that products supplied exclusively through co-conspirator Sherwood Southwest, LLC were inferior, overpriced goods fundamentally different from what had been advertised—products destined to generate customer complaints, not repeat business **(Ex. C)**. Co-conspirator CVB Inc., operating as Malouf Companies, functioned as an additional captive supplier in this closed system, ensuring dealers had no ability to source competitive products outside Defendants' controlled supply chain. The pricing scheme was deliberately engineered: Defendants supplied four-inch mattress pads at inflated costs, coached dealers to mark them up an additional $150

4

or more, and positioned consumer financing through co-conspirator West Creek Financial, Inc. d/b/a Koalafi directly on sales calls to ensure overpriced, inferior products could still be sold to unsuspecting customers **(Ex. E)**. This was not optional guidance—Defendants actively enforced these pricing directives, supplier exclusivity, and sales methods on their dealer network **(Ex. M)**. Each co-conspirator profited from every dealer who entered the system regardless of whether that dealer survived: Sherwood and Malouf collected revenue on every forced inventory purchase, Koalafi collected fees on every financed transaction, and Defendant Shoffner collected territory fees and wholesale markups—a structure guaranteeing that only the dealer bore the risk of failure. When Plaintiff raised these concerns in good faith and sought resolution, Defendant Shoffner's response was immediate: denial, retaliatory termination, and litigation **(Ex. A)**. This is the identical pattern documented across two decades of federal litigation, state regulatory actions, and the litigation history reflected throughout Plaintiff's exhibits—recruiting dealers under false pretenses, extracting their capital, terminating them when they object, and silencing them through forced arbitration.

4.      Plaintiff's reliance on Defendants' fraudulent representations led directly to a cascade of irreversible harm: the execution of a lease dictated and approved by Defendants as a prerequisite to disclosure, the discovery of the scheme's true nature, a good-faith attempt to resolve the issues internally **(Ex. A)**, immediate retaliatory termination, and now a years-long legal siege designed to bankrupt him. Defendants have weaponized a concealed arbitration clause Plaintiff was never meaningfully given an opportunity to review to demand a $60,000 "buyout," threaten a lien on his home, and pursue a $299,000 arbitration award—all while Plaintiff remains trapped paying a lease on a business he cannot operate, fighting for his financial survival instead of rebuilding his livelihood.

**This is not a breach of contract; it is a coordinated campaign of financial entrapment and attrition.** Plaintiff has documented a six-stage pattern of coercive escalation—from concealed contract to inflated arbitration claim—as detailed in **Exhibit X**.

5. This lawsuit is not about any contract. It is about independent torts and statutory violations committed by Defendant Shoffner personally and by his co-conspirators— conduct that would exist and would harm the public even in the absence of any enforceable agreement. Plaintiff's claims arise from fraud, civil conspiracy, and violations of federal and state antitrust laws. These antitrust claims protect public rights in free competition that cannot be waived, modified, or governed by private agreement. Defendant Shoffner cannot hide behind corporate forms, contractual provisions, or arbitration agreements because he is sued individually for his personal fraudulent conduct and for orchestrating a multi-defendant conspiracy to restrain trade in violation of public law.

6. This Court has federal question jurisdiction over Plaintiff's claims under the Sherman Antitrust Act, 15 U.S.C. §§ 1–2, pursuant to 28 U.S.C. § 1331. Defendants' conduct substantially affected interstate commerce, including the interstate sale of mattresses, accessories, and consumer financing across multiple states from at least 2009 to the present.

7. This Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367.

**VENUE**

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

9. Defendant Sherwood Southwest, LLC operates a large mattress manufacturing and distribution facility at 400A Tittle Drive, Lewisville, Texas (Denton County), located within the Northern District of Texas, Dallas Division.

10. Defendant CVB Inc. operates a major 1 million square foot distribution center in Midlothian, Texas (Ellis County), located within the Northern District of Texas, Dallas Division. As documented in the Opening Order sent to Plaintiff by Defendant Shoffner **(Ex. B)**, every product Plaintiff was permitted to purchase—every mattress, foundation, and accessory—came exclusively from Defendants Sherwood Southwest's (mattresses)

Lewisville facility and CVB Inc.'s (accessories) Midlothian facility, both located within this District.

11. The conspiracy to restrain trade alleged herein was implemented, controlled, and executed through these Northern District facilities. The exclusive dealing requirements that form the basis of Plaintiff's antitrust claims were imposed and enforced through Opening Orders originating from these facilities within this District. The anticompetitive conduct directly harmed Plaintiff through operations conducted from these locations within this District.

12. The propriety of this forum is further demonstrated by Defendant Shoffner's own prior conduct in invoking Texas court jurisdiction. As documented in **Exhibit EE**, Defendant Shoffner, acting through his corporate instrumentality, voluntarily invoked the jurisdiction of a Texas court in Tarrant County to domesticate an arbitration award, thereby affirmatively attorning to the jurisdiction of Texas courts.

## REGULATORY NOTICE, WILLFUL RECIDIVISM, AND PUBLIC INTERESTS

13. **Prior Regulatory Finding and Personal Consent Order.**

In December 2019, the Washington State Department of Financial Institutions concluded an investigation into Defendant Charles Edwin Shoffner's enterprise and entered a Consent Order **(Ex. D)**, signed personally by Shoffner as Managing Member of Mattress By Appointment, LLC ("MBA"). Although the Consent Order contained a standard "neither admits nor denies" clause, Shoffner formally agreed to binding findings and remedies, including that MBA's dealership offerings constituted "business opportunities" under Washington law and that violations of the Washington Business Opportunity Fraud Act had occurred, including:

14. Operating an unregistered business opportunity (RCW 19.110.050);

15. Failing to provide required disclosure documents to purchasers prior to accepting payment (RCW 19.110.070); and

7

16. Making earnings claims of $75,000–$150,000 annually without disclosing the basis or assumptions for such projections (RCW 19.110.120).

17. Shoffner further agreed to immediately cease and desist from these practices, reimburse $5,000 in investigative costs, waive the right to a hearing and judicial review, and expressly acknowledged that "WILLFUL VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE."

18. By personally executing this Consent Order and complying with its terms, Shoffner received formal, documented notice—memorialized in an official state enforcement action—that his recruitment, onboarding, and disclosure practices violated business-opportunity fraud laws. A reasonable person in Shoffner's position, having executed such an order under explicit criminal-penalty warning, would understand that continuation of materially identical practices in other jurisdictions constituted knowing and willful misconduct.

19. **Willful Recidivism: The 2024 Texas Deployment.**

    Notwithstanding this notice, Defendant Shoffner redeployed the same prohibited model in Texas in 2024. As alleged herein, Defendants engineered substantial and irreversible financial commitments—including lease execution (¶122), deposits (¶188), and mandatory inventory purchases exceeding $92,500 (¶193, **Ex. BB**)—before Plaintiff had any meaningful opportunity to discover the concealed Dealer Agreement (¶121–130). This conduct replicated the very disclosure failures Shoffner had been ordered to cease.

20. Defendants simultaneously repeated the same category of unsubstantiated earnings representations—"earn up to $150,000 per year," "recoup investment in 60 days," and "50–80% off retail pricing" (¶112, **Ex. DD**)—without disclosing dealer failure rates, exclusive-dealing restraints, or supplier and financing control that rendered such claims unattainable. Shoffner further imposed franchise-level operational control while disclaiming franchise status and failing to provide an FTC Franchise Disclosure Document or comply with the Texas Business Opportunity Act, mirroring the unregistered business-opportunity conduct cited by Washington regulators (¶179–189).

21. **Legal Significance: Knowledge, Intent, and Pattern.**

The 2019 Consent Order is not background or character evidence. It is highly probative proof of notice, knowledge, and intent. Defendant Shoffner's continuation of materially identical conduct after agreeing to cease such practices, paying investigative penalties, and being warned of criminal liability demonstrates deliberate, bad-faith misconduct consistent with willful fraud rather than mistake or negligence. This pattern directly supports Plaintiff's claims for common-law fraud, violations of the Texas Deceptive Trade Practices Act, federal antitrust violations, and the availability of punitive and treble damages.

22. **Public Enforcement Interests and Non-Waivable Statutory Duties.**

Plaintiff pleads this regulatory history and recidivist conduct to place before the Court facts demonstrating that Defendants' actions implicate public-law protections that extend beyond any private contractual relationship. Antitrust, business-opportunity, and consumer-protection statutes safeguard public interests in fair competition, transparent commerce, and market integrity—interests that cannot be waived, released, or extinguished by private agreement.

23. Plaintiff does not seek to direct or compel regulatory or prosecutorial action by this Court or by any agency. The purpose of this pleading is to present a complete factual record relevant to adjudication of Plaintiff's federal statutory claims and the availability of statutory remedies, including enhanced damages.

24. **Co-Conspirator Liability.**

Defendant Shoffner's co-conspirators—Sherwood Southwest, LLC; CVB Inc.; and West Creek Financial—are liable for their participation in this fraudulent and anticompetitive scheme. An unlawful agreement may be inferred from a conscious commitment to a common design. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). By integrating their products, financing, and enforcement mechanisms into Shoffner's control apparatus, accepting the benefits of exclusive dealing and supplier control, and engaging in retaliatory conduct to enforce compliance, these entities provided substantial

9

assistance to a system they knew or should have known was built on adjudicated fraud and unlawful recidivism. *See Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996).

## CHOICE OF LAW

25.    Texas substantive law governs Plaintiff's state law claims. The exclusive dealing requirements were imposed on Plaintiff's Texas business operations within this District, the injury occurred in Texas, Defendant Shoffner's fraudulent conduct was directed at Plaintiff in Travis County, Texas, and the challenged conduct restrained trade in Texas markets. Texas has the most significant relationship to the parties and claims. Federal antitrust claims are governed by federal law. The independent tort and statutory claims arising from Defendants' conduct in Texas are governed by Texas law, which cannot be displaced by any fraudulently induced choice-of-law provision or private ordering. Public rights in free competition and protections against fraud cannot be waived or relocated by private contract fraudulently induced. **(Ex. HH)**

## PERSONAL JURISDICTION

**This Court has personal jurisdiction over all Defendants.**

26.    Defendant Charles Edwin Shoffner purposefully directed his fraudulent and anticompetitive activities toward Texas. He recruited Plaintiff, a Texas resident, to open and operate a store in Austin, Texas. Through his agents, he directed Plaintiff to lease Texas commercial property, approved all operational decisions, and exercised continuous, franchise-level control over the Texas business. He has affirmatively availed himself of Texas courts by personally enforcing legal rights in Texas litigation **(Ex. EE)**. His conduct was intentionally aimed at Texas, and he could reasonably anticipate being haled into a Texas court.

27.    Defendant Sherwood Southwest, LLC is subject to specific and general personal jurisdiction in this District. It is registered to do business in Texas and operates a large mattress manufacturing and distribution facility at 400A Tittle Drive, Lewisville, Texas (Denton County), located within this District. This facility manufactured, sold, and

10

shipped the mattresses Plaintiff was contractually forced to purchase under the exclusive dealing scheme. Sherwood purposefully availed itself of the Texas market through this permanent Texas facility and its ongoing commercial relationships with Texas dealers like Plaintiff. Plaintiff's injuries arise directly from Sherwood's Texas-based activities.

28.    Defendant CVB Inc. (d/b/a Malouf) is subject to specific personal jurisdiction in this District. It is a foreign corporation registered to do business in Texas (SOS File No. 803594857) and maintains a registered agent at C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas, within this District. It operates a major 1 million square foot distribution center in Midlothian, Texas (Ellis County), also within this District. This facility served as the exclusive source for accessories Plaintiff was mandated to purchase. CVB Inc. has conducted continuous, substantial commercial operations in Texas for years. Plaintiff's injuries arise directly from CVB Inc.'s Texas-based distribution activities.

29.    Defendant West Creek Financial, Inc. (d/b/a Koalafi) has purposefully availed itself of the Texas market and is subject to specific personal jurisdiction in this District. Koalafi maintains thousands of merchant partnerships with Texas retailers. Its lease-to-own financing program is deeply integrated into the Texas economy: it pays Texas dealers, collects Texas sales tax from consumers, and directly remits those taxes to the Texas Comptroller of Public Accounts. It maintains a registered agent in Texas at C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas. Its specific financing relationship with Plaintiff—a Texas resident for a Texas business—was a direct and foreseeable result of its deliberate exploitation of the Texas market.

30.    Plaintiff's claims arise directly from Defendants' Texas-directed conduct. The injuries— financial losses, business destruction, and antitrust harm—were suffered in Texas and are the direct and foreseeable result of Defendants' intentional, targeted activities aimed at Texas.

31.    The exercise of personal jurisdiction over all Defendants comports with traditional notions of fair play and substantial justice. Texas has a compelling interest in

11

adjudicating claims arising from fraud, anticompetitive conspiracies, and deceptive practices targeting its residents and markets.

## PARTIES

32. Plaintiff **JAMES DE LOS SANTOS** is an individual residing in Travis County, Texas. He is a single father with sole conservatorship of his four-year-old daughter and is the owner of Lux Value Mattress, a private appointment-only mattress showroom in Austin, Texas.

33. Defendant **CHARLES EDWIN SHOFFNER** is an individual residing in Greenville, South Carolina. As a federal court has determined, Defendant Shoffner exercises complete control over the corporate entity known as Mattress By Appointment LLC such that it has no separate mind, will, or existence apart from him. *See Retail Service Systems, Inc. v. Mattress By Appointment, LLC*, Case No. 2:15-cv-2769, Dkt. 32 (S.D. Ohio Nov. 21, 2016) **(Ex. R)**. Defendant Shoffner built his business operation upon a trade secret system that Ohio courts adjudicated as stolen in 2009 **(Ex. G)**, an illicit foundation for which punitive damages were awarded. In 2019, Defendant Shoffner personally signed a Consent Order with the Washington State Department of Financial Institutions resolving regulatory findings that his business practices violated Washington's Business Opportunity Fraud Act (Ex. D). Defendant Shoffner has been the directing mind behind the fraudulent and anticompetitive business model at issue in this case since at least 2011. He is sued in his individual capacity for his personal tortious conduct, for orchestrating the multi-defendant conspiracy alleged herein, and based on the judicial determination that he operates through a corporate alter ego.

34. Defendant **SHERWOOD SOUTHWEST, LLC** is a Florida limited liability company registered to do business in Texas (SOS File #801820815) since July 18, 2013. Its principal place of business is 1000 Tempur Way, Lexington, Kentucky 40511. Its registered agent in Texas is Alton S. Hayden, 1825 W. Beltline Road, Carrollton, Texas 75006. Sherwood operates a large mattress manufacturing and distribution facility at 400A Tittle Drive, Lewisville, Texas 75056, which served as a primary facility for implementing the exclusive dealing conspiracy alleged herein.

12

35.    Defendant **CVB INC.** is a Utah corporation (doing business as Malouf Companies) with its principal place of business in Logan, Utah. Its registered agent in Texas is C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201. CVB Inc. operates a major 1 million square foot distribution center in Midlothian, Texas (Ellis County), located within the Northern District of Texas, Dallas Division, and conducts substantial business throughout Texas. On June 24, 2022, the Texas Comptroller of Public Accounts forfeited CVB Inc.'s Texas certificate of authority for failure to file franchise tax returns and pay franchise tax. CVB Inc. operated in Texas without legal authority from June 24, 2022 through October 24, 2023—a period of sixteen months during which it conducted millions of dollars in commercial transactions while legally prohibited from doing business in the state. Despite operating as a forfeited entity during this period, CVB Inc. continued to hold itself out as an authorized supplier to dealers operating under Defendant Shoffner's business system, maintained its exclusive dealing arrangement with him, and knowingly concealed its forfeited status from Plaintiff and other dealers, thereby inducing reliance on representations of lawful business authority it did not possess.

36.    Defendant **WEST CREEK FINANCIAL, INC.** is a Virginia corporation doing business as Koalafi, with its principal place of business in Richmond, Virginia. Its registered agent in Texas is C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201. West Creek Financial provides consumer financing services and maintains an extensive network of thousands of merchant partners in Texas, including mattress retailers. Its services were operationally integrated into the sales and control mechanisms of Defendant Shoffner's enterprise.

## FACTUAL ALLEGATIONS

### I. INTRODUCTION: A LONGSTANDING PATTERN OF FRAUDULENT BUSINESS PRACTICES

37.    This action arises from a documented pattern of deceptive business practices carried out by Defendants across multiple states over more than fifteen years. The scheme is not an isolated misconduct but a repeatable enterprise that has relied on misrepresentation,

unlawful control, and concealment to extract value from individuals recruited into its system. Defendant Shoffner's current operation represents the most recent incarnation of this enterprise, which, as a federal court has found, he controls as his alter ego **(Ex. R)**.

38. As detailed below, Defendant Shoffner's conduct toward Plaintiff mirrors the same structural features observed in prior iterations of the scheme: the knowing use of a misappropriated business model, the imposition of undisclosed control mechanisms, and the systematic exploitation of dependent operators. The factual allegations that follow trace how Defendant Shoffner acquired this fraudulent enterprise and how he deployed it to cause direct harm to Plaintiff.

39. The fraudulent business system at the heart of this case originated with trade secret theft in the year 2000. Darren Brett Conrad, while employed by Power Marketing Direct, Inc. ("PMD"), stole PMD's proprietary business methodology, including its recruitment tactics, advertising scripts, training manuals, and dealer control mechanisms.

40. In January 2009, the Franklin County Court of Common Pleas (Ohio) entered judgment against Conrad in *Power Marketing Direct, Inc. v. Darren Conrad*, Case No. 04CVH-02-1519 **(Ex. G)**, finding him liable for misappropriation of trade secrets under Ohio's Uniform Trade Secrets Act. The court awarded PMD $180,000 in damages (including $40,000 in punitive damages for willful and malicious conduct) and entered a permanent injunction prohibiting Conrad from using PMD's stolen system.

41. The Ohio court specifically found that PMD's methodology—including its unique 3-5-line classified ad system, verbatim phone scripts, training manuals, and dealer management systems—constituted protected trade secrets. The court found that Conrad had "essentially conceded that he had established a competing business which mirrored the program established at PMD." The court further found Conrad's violations to be "flagrant" and "ongoing."

42. This 2009 judgment established conclusively that the business system Defendant Shoffner would later acquire was, from its inception, adjudicated stolen intellectual property. As established in the following sections, Defendant Shoffner had actual

14

knowledge of this injunction when he financed Conrad in 2011 and when he demanded control of the illicit operation.

43. By the time Defendant Shoffner completed his acquisition of the stolen business system and rebranded it as Mattress By Appointment, the enterprise no longer functioned as an independent or self-contained operation. To operate at scale and to effectively enforce dealer compliance, the system depended on the coordinated participation of exclusive suppliers and a captive financing partner. These relationships were not incidental; they were necessary to impose dependence, suppress competition, and extract value from recruited dealers.

44. Defendant Sherwood Southwest, LLC was integrated into the enterprise as the exclusive mattress manufacturer and supplier FOR. Sherwood manufactured and distributed the mattresses dealers were required to sell, including through its Texas manufacturing and distribution facility. Dealers were prohibited from sourcing competing mattresses from alternative manufacturers, rendering Sherwood the sole practical source of core inventory and a primary mechanism by which exclusive dealing restraints were enforced, thereby guaranteeing itself a captive customer base insulated from price or quality competition.

45. Defendant CVB Inc. (operating as Malouf Companies) was integrated as the exclusive supplier of accessories, including pillows, protectors, and related products. Dealers were required to purchase these accessories through CVB under mandatory purchasing rules enforced through Opening Orders and onboarding requirements **(Ex. B, C)**. These restrictions prevented dealers from sourcing accessories from competing vendors and further entrenched supplier lock-in, thereby guaranteeing CVB a captive customer base insulated from price or quality competition.

46. Defendant West Creek Financial, Inc., doing business as Koalafi, was integrated as the exclusive consumer-financing partner within the enterprise. Koalafi's representatives were embedded in dealer coaching calls, and its financing program was embedded into the sales process and functioned as a control mechanism by conditioning access to consumer credit on dealer compliance. Financing access was used to pressure dealers, suppress resistance, and penalize those who attempted to exit or challenge the system.

47.  Each of these entities knowingly accepted the benefits of foreclosure-protected demand created by the exclusive dealing restraints imposed on dealers. By supplying mandatory inventory, accessories, and financing under coordinated restrictions, Sherwood Southwest, CVB Inc., and Koalafi became essential operational components of the enterprise Defendant Shoffner controlled, without which the scheme could not function as designed.

*Loss of Irreplaceable Time, Familial Harm, and Continuing Emotional Injury*

48.  Defendants' conduct caused harm that extends far beyond economic loss. As a direct and foreseeable result of Defendants' retaliatory termination, coercive demands, and continuous litigation pressure, Plaintiff lost irreplaceable time with his family during periods that can never be recovered.

49.  During the escalation of Defendants' conduct, Plaintiff's time and mental capacity were consumed by constant emergency filings, legal study, and defensive response exceeding fifty hours per week. Plaintiff was unable to work consistently or regain financial stability because each attempt to recover was predictably disrupted by new filings, threats, or procedural demands initiated by Defendants.

50.  This sustained disruption occurred while Plaintiff was raising a young child. Plaintiff's daughter observed Plaintiff's constant absence, financial strain, and inability to participate in ordinary family activities. Plaintiff lost irreplaceable parenting time during formative years—time that cannot be repurchased or restored through later success.

51.  At the same time, Plaintiff's mother suffered terminal decline following a fall and subsequent institutionalization from which she never returned home. Approximately one month before her death, Plaintiff learned that his mother was dying. Under ordinary circumstances, a son would spend that time at his mother's bedside, present, mourning, and preparing for loss.

52.  Instead, Plaintiff was consumed by Defendants' escalating legal and financial pressure. During his mother's final weeks, Plaintiff was drafting his first motion to remand without legal training, attempting to understand basic procedural rules while in a state of grief-

induced cognitive impairment. Plaintiff repeatedly requested bereavement accommodations. Defendants' counsel offered only a single week of relief. Plaintiff was forced to file multiple emergency submissions with the American Arbitration Association to obtain a second week.

53. As a result, Plaintiff saw his mother only twice during the final month of her life. Plaintiff was unable to mourn, process, or obtain closure, operating instead in a state of cognitive fog caused by grief compounded by constant legal threat. The quality and coherence of Plaintiff's filings during that period were visibly impaired—a direct and foreseeable consequence of Defendants' refusal to suspend pressure during a known period of terminal illness.

54. This deprivation of time and presence is ongoing. Plaintiff's father is currently experiencing serious and progressive health decline and contacts Plaintiff daily. As a direct result of Defendants' continued litigation pressure and the financial instability they caused, Plaintiff remains unable to plan, provide support, or spend meaningful time with his father in a stable or intentional way. Even when Plaintiff is physically present, his mental capacity is consumed by unresolved financial loss, constant legal defense, and the anticipation of new filings. Plaintiff is therefore deprived not only of time, but of full presence—a continuing, foreseeable, and irreparable injury.

55. Defendants knew or should have known that their conduct would consume Plaintiff's time, impair his ability to work, fracture family relationships, and permanently deprive Plaintiff of meaningful familial presence during non-recoverable periods of life. These harms were not incidental. They were the predictable consequence of Defendants' actions.

## II. DEFENDANT SHOFFNER'S KNOWING ACQUISITION OF THE STOLEN SYSTEM

56. Defendant Charles Edwin Shoffner was not an innocent subsequent purchaser but a knowing and willing participant in this fraudulent scheme from its earliest days. As early as 2009, immediately following the Ohio trade secret judgment **(Ex. G)**, Defendant

Shoffner became financially involved with Conrad's ongoing stolen-trade-secret operation.

57. In Defendant Shoffner's own sworn 2011 statement, he admitted: "In 2009, after the Franklin County Court of Common Pleas entered an injunction against Darren Conrad, I, along with other officers of Park Place Corporation, spoke with Conrad and we advised him to fully comply with the terms of the injunction." **(Ex. H)**

58. This admission proves Defendant Shoffner had direct, contemporaneous knowledge in 2009 that Conrad's business system was the subject of a court judgment for trade secret theft and a permanent injunction. Despite this knowledge, Defendant Shoffner chose to embed himself deeper into the fraudulent enterprise rather than distance himself from it.

59. Indeed, Defendant Shoffner hired Conrad as a sales representative for his company, Park Place Corporation. Through this relationship, Defendant Shoffner structured financial arrangements to profit directly from Conrad's dealer network—monetizing the very stolen trade secret system the injunction prohibited.

60. In 2011, Defendant Shoffner escalated his involvement: he personally loaned money to Conrad to create Carolina Bedding Direct, LLC. In Defendant Shoffner's own words: "In 2011, I loaned Darren Conrad money to create Carolina Bedding Direct, LLC." **(Ex. H)** With this loan, Defendant Shoffner transitioned from profiteer to financier, injecting capital to expand an enterprise he knew was built on adjudicated theft.

61. By 2013, Defendant Shoffner purchased a 45% ownership share of Carolina Bedding Direct, LLC, becoming a co-owner of the illicit system. Then, in 2014, following Conrad's bankruptcy **(Ex. N)**, Defendant Shoffner purchased the remaining 55% share, seizing complete control of the fraudulent enterprise.

62. Conrad's sworn affidavit from 2015 federal litigation confirms Defendant Shoffner's conscious wrongdoing: "Mr. Shoffner knew about the company's business model at the time he became an owner. He also knew about PMD's prior lawsuit and injunction against me, and he knew that my business continued to use the detailed sales system that I helped develop at PMD." **(Ex. V)**

63.   Conrad further confirmed the scheme's continuity: "The system of selling mattresses has changed very little since my time at PMD. Each of my companies has used that same system, which is almost entirely based on the sales system developed at PMD." **(Ex. V)**

64.   After acquiring full control in 2014, Defendant Shoffner rebranded the operation but preserved its criminal core, retaining the illegal mechanisms of the stolen system:

(a)   financially trapping dealers through substantial upfront investments extracted before disclosing crippling restrictions;

(b)   enforcing mandatory exclusive dealing with designated suppliers; and

(c)   retaliatory enforcement through systematic litigation and termination threats to crush dealer resistance.

65.   The systematic nature of this retaliatory litigation is proven by **Exhibit K**, a National Litigation Tracker. Despite limited resources, Plaintiff identified 62 civil cases involving Defendant Shoffner's enterprise from 2014–2024, showing Defendant Shoffner initiated 61 enforcement actions against dealers compared to only 1 case where he was sued as a defendant—an extraordinary 61:1 plaintiff ratio **(Ex. K)** that demonstrates Defendant Shoffner's model depends on legal intimidation, not fair dealing. This predatory litigation strategy is exemplified by the documented pattern of coercive escalation deployed against Plaintiff: **after Plaintiff raised legal inquiries into Defendants' illegal practices, Defendants retaliated with termination and fraudulently manipulated jurisdiction to inflate a $60,000 contractual buyout into a $299,000 arbitration claim, adding non-signatories and assigning a biased arbitrator—tactics chronicled in Exhibit X.**

66.   Critically, this litigation campaign continued unabated after 2019, the same year Defendant Shoffner personally signed the Washington State Consent Order **(Ex. D)**. In that Order, Defendant Shoffner signed and acknowledged violations of Washington's Business Opportunity Fraud Act and agreed to cease and desist. The Order explicitly warned him that "WILLFUL VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE."

67.    In defiance of this judicial warning, Defendant Shoffner continued his systematic litigation campaign against dealers. This deliberate continuation of the same tactics after being formally ordered to stop and personally threatened with criminal liability demonstrates knowing, willful, and bad-faith persistence in unlawful conduct.

68.    Defendant Shoffner's signature on the 2019 Washington Consent Order is a formal, binding agreement to the Order's findings and remedies, which resolved regulatory conclusions that his business practices violated the law. Combined with his post-order conduct, it proves a continuous pattern of knowing and willful fraud.

69.    This timeline establishes irrefutably that Defendant Shoffner's fraudulent conduct began not in 2019, but in 2009, when he knowingly invested in, financed, and ultimately commandeered a business built on stolen intellectual property.

## III. ALTER EGO, UNITY OF INTEREST, AND PERSONAL LIABILITY OF DEFENDANT C. EDWIN SHOFFNER

### A. Complete Domination and Control Over Corporate Instrumentalities

70.    Defendant Charles Edwin Shoffner has exercised such complete dominion and control over the entities operating under the Mattress By Appointment ("MBA") name and its predecessors that those entities have no separate mind, will, or existence of their own and function solely as instruments of Shoffner himself.

71.    From at least 2009 forward, Shoffner personally financed, acquired, controlled, and directed the enterprise at issue. As alleged above, Shoffner knowingly invested in and financed a business system adjudicated to be stolen intellectual property, escalated from financier to majority owner, and ultimately seized complete ownership and operational control by 2014.

72.    Shoffner did not operate at arm's length from the entities he controlled. Rather, he dictated and personally controlled all material aspects of the enterprise, including recruitment scripts, dealer onboarding practices, pricing structures, supplier relationships, marketing approvals, dispute resolution mechanisms, and litigation strategy.

73. Shoffner used the corporate entities as vehicles to implement policies and practices he personally designed and enforced, including mandatory exclusive dealing, personal markups on supplier goods, concealed restrictions imposed after financial commitment, and retaliatory enforcement against questioning dealers.

74. Shoffner's domination and control extended to the manipulation of corporate formalities and representations. In prior federal litigation, Shoffner made materially false sworn statements regarding entity formation, ownership, operations, and asset transfers— statements later contradicted by official state records **(Ex. F, I, O)**—demonstrating the entities' use as tools to obscure his personal involvement and evade judicial scrutiny.

75. A federal court reviewing this conduct found prima facie evidence that Shoffner exercised "complete control" over his entities such that they possessed "no separate mind, will, or existence of their own" **(Ex. R)**. Despite this judicial finding, Shoffner has continued to operate through the same corporate structures to perpetuate the same fraudulent business practices.

**B. Documented Pattern of Corporate Abuse and Use of the Corporate Form**

76. Federal courts, regulators, and Shoffner's own sworn admissions establish a sustained and deliberate pattern of abusing the corporate form to perpetrate fraud and evade accountability, including:

   a. **Knowing Investment in Stolen Trade Secrets:** Shoffner knowingly invested in and profited from a business system adjudicated to be stolen intellectual property, despite actual knowledge of the 2009 Ohio judgment and permanent injunction **(Ex. G, V)**.

   b. **Interchangeable Shell Entities & Asset Shifting:** Shoffner operated multiple entities under the identical "Mattress By Appointment" trade name without functional separation, deliberately obscuring corporate identity and shifting assets and liabilities to frustrate creditors and evade judgments **(Ex. R, S, T)**.

c.   **Entity Churn to Avoid Accountability:** When entities faced legal exposure, Shoffner formed new corporate entities to continue the same conduct under different legal forms while preserving the same operational scheme **(Ex. S, T)**.

d.   **Personal Funding and Acquisition of a Tainted Enterprise:** Shoffner personally loaned funds to an enjoined party to form a key entity and later acquired full ownership of the enterprise, personally profiting from its unlawful foundation **(Ex. V, X)**.

e.   **Litigation as a Strategic Tool:** In 2014, Shoffner personally funded a $600,000 bankruptcy settlement whereby he (1) purchased a rival's 55% ownership stake, (2) paid $150,000 directly to Retail Service Systems ("RSS") to resolve litigation, and (3) contractually barred RSS from seeking any discovery into his finances or corporate structure. One month later, Shoffner emailed RSS proposing they "hit [the same rival] from two angles" using their respective entities as coordinated litigation tools, revealing the use of lawsuits as a strategic enforcement and intimidation mechanism rather than good-faith dispute resolution **(Ex. N, Q)**.

f.   **Admissions of Scheme Development and Control:** Shoffner admitted under oath that he collaborated to develop the operational "playbook" used to control dealers, operated a "private label" system to conceal wholesale costs and inflate prices for personal profit, and confirmed a high-turnover dealer model (approximately 20–30 exits) designed to cycle through dealers after capital extraction **(Ex. J)**.

## C. Shoffner's Direct, Personal Participation in the Wrongful Conduct

77.   Shoffner personally participated in, directed, and approved the conduct giving rise to Plaintiff's claims. His actions were not undertaken merely in a representative capacity but were the direct acts of an individual exercising hands-on control.

a.   He personally signed a Washington State Consent Order agreeing to binding findings and remedies for violations of the Business Opportunity Fraud Act (2019) **(Ex. D)**.

b.  He personally designed and approved the deceptive Dealer Success Kit and, post-termination, personally demanded its return to suppress evidence **(Ex. BB, CC)**.

c.  He personally controlled anticompetitive exclusive-dealing arrangements and admitted under oath to personally modifying contracts, dictating pricing, and managing product selection **(Ex. J)**.

d.  He personally designed the trust-based recruitment strategy to induce Plaintiff's participation and suppress contract scrutiny.

78.  Shoffner further personally caused and directed the use of interstate mail and wire communications as essential tools of the scheme, including:

a.  Mailing the concealed Dealer Agreement and fraudulent marketing materials **(Ex. AA, BB)**.

b.  Causing emails that conditioned delivery of the Agreement on sequential financial commitments **(Ex. Z)**.

c.  Causing text-message communications instructing agents on implementing bait-and-switch sales practices **(Ex. Y, E)**.

d.  Causing electronic refusals to provide written clarification of restrictive policies, intentionally avoiding a discoverable record **(Ex. A)**.

79.  The unity of interest and ownership between Shoffner and his entities is complete in practice. The entities failed to observe basic corporate formalities and functioned solely as instrumentalities of Shoffner's personal enterprise, carrying out his personally-designed schemes.

80.  Observance of the corporate form under these circumstances would sanction fraud and promote injustice. Shoffner used his entities as a calculated tool to recruit Plaintiff, extract substantial upfront investments, impose undisclosed and unlawful control mechanisms, and shift liability outward while retaining personal control and profit.

81.  Under Texas law, when a corporate form is used as an alter ego to perpetrate fraud, evade existing obligations, or achieve inequitable results, courts may disregard the corporate

fiction and impose personal liability. The facts alleged establish unity of interest, abuse of the corporate form, and the use of controlled entities as instruments of wrongdoing.

82.    Accordingly, Defendant Charles Edwin Shoffner is personally liable for the acts and omissions of the MBA enterprise and its related entities, and may not invoke the corporate form to shield himself from responsibility for the unlawful conduct alleged herein.

### *Equitable Basis for Piercing the Corporate Veil*

83.    Defendant Shoffner did not merely benefit from the corporate form; he affirmatively used it as an instrument to perpetrate fraud, suppress discovery, evade judicial scrutiny, and externalize liability while retaining personal control and profit. The facts alleged establish absolute unity of interest between Shoffner and the MBA entities, pervasive domination over operations and decision-making, and repeated use of entity opacity to mislead dealers, regulators, and courts. Respecting the corporate fiction under these circumstances would sanction fraud and promote injustice by allowing Shoffner to monetize a deceptive system while insulating himself from accountability. Under Texas law, where the corporate form is used as a vehicle for fraud or inequitable conduct, courts may disregard the fiction of separateness and impose personal liability. Accordingly, Shoffner may not invoke the corporate veil to shield himself from responsibility for the unlawful acts alleged herein.

84.    Texas courts pierce the corporate veil where (1) unity of interest exists, (2) the corporate form is used to perpetrate fraud or evade obligations, and (3) respecting the form would sanction injustice. *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 454 (Tex. 2008). Federal courts applying Texas law likewise disregard the corporate form where it is used to conceal fraud, suppress discovery, or manipulate litigation outcomes. Each of these conditions is independently and collectively satisfied here.

## IV. DEFENDANT SHOFFNER'S DIRECT ROLE IN THE 2024 FRAUDULENT INDUCEMENT

24

85. In early 2024, Defendant Charles Edwin Shoffner, through the enterprise he personally controlled, recruited Plaintiff James De Los Santos into the Mattress By Appointment system in Austin, Texas.

86. The recruitment process was not conducted by independent entities or autonomous personnel. It followed a standardized script personally designed, approved, and enforced by Shoffner, emphasizing representations of dealer independence, flexible hours, low overhead, and the ability to sell mattresses at "50–80% off" traditional retail prices. (See their website screenshot as of 02/06/2026, **Ex. DD**)

87. These representations were made through direct communications and through agents acting under Shoffner's direction, including designated coaches and onboarding personnel **(Ex. Y, Z)**. Shoffner personally designed the recruitment strategy to build trust while discouraging or bypassing meaningful review of governing contractual restrictions.

88. Shoffner personally approved and deployed the "Dealer Success Kit" as the primary onboarding mechanism. The Dealer Agreement was physically concealed within the kit behind multiple tabs labeled as reference or training materials, obscuring its legal significance until after Plaintiff had already incurred substantial financial obligations **(Ex. BB)**.

89. Plaintiff was required to commit to significant, irreversible financial expenditures— including lease execution, deposits, and mandatory inventory purchases—before being provided a meaningful opportunity to review the Dealer Agreement governing his rights and obligations **(Ex. Y, Z, BB)**.

90. After Plaintiff raised legal concerns and questioned the restrictions imposed, Defendant Shoffner, through agents acting under his direction, refused to provide written clarification of the policies, stating that further explanation "would not serve the interests of MBA," and affirmatively disengaged to avoid creating a discoverable record **(Ex. A)**.

91. Following Plaintiff's termination, Shoffner personally demanded the return of the Dealer Success Kit within five days **(Ex. CC)**, demonstrating consciousness of wrongdoing and

intent to suppress evidence of the concealed contractual terms and deceptive onboarding process.

92. Shoffner further personally controlled the pricing and product access available to Plaintiff. Despite public representations of multi-brand access and deep discounts **(Ex. DD)**, Plaintiff was restricted to a narrow, non-competitive subset of products, while being prohibited from sourcing alternatives **(Ex. B, C)**.

93. Through agents acting under Shoffner's direction, Plaintiff was instructed to use "bait" products not intended for genuine retail sale to attract consumers and then switch them to higher-priced, financed alternatives—a practice admitted by Shoffner's representatives as intentional **(Ex. E)**.

94. Defendant Shoffner personally caused and directed the use of interstate mail and wire communications to execute the foregoing conduct, including the mailing of concealed contractual materials **(Ex. AA, BB)**, electronic communications conditioning agreement delivery on financial commitments **(Ex. Z)**, and text-message instructions implementing deceptive sales practices **(Ex. Y, E)**.

95. These acts were not isolated errors or unauthorized deviations. They were the direct result of policies personally designed, approved, and enforced by Defendant Shoffner as part of a repeatable business system.

## V. THE MASTERMIND REPEATS THE FRAUD: OPERATION OF HIS ENTITIES

96. Operating under multiple LLC's **(Ex. S, T)**, Shoffner implemented the stolen Carolina Bedding playbook across multiple states. The core fraudulent and anti-competitive components remained unchanged: (a) bait-and-switch recruitment promising "independent dealerships"; (b) mandatory exclusive purchasing from designated suppliers; (c) Shoffner's personal markup on supplier goods; and (d) the use of arbitration clauses and inflated claims to retaliate against questioning dealers **(Ex. K)**.

## VI. SHOFFNER'S 2015 PERJURY TO CONCEAL THE STOLEN BUSINESS MODEL

97. Defendant Shoffner has demonstrated a chronic pattern of making materially false sworn representations concerning his corporate structure, leading courts to explicitly doubt his honesty. In 2015 federal litigation (*Retail Service Systems, Inc. v. Mattress By Appointment, LLC*, S.D. Ohio Case No. 2:15-cv-02769), Shoffner made at least six sworn statements regarding entity formation, operations, and asset transfers that were directly falsified by official state corporate filings **(Ex. F, I)**.

98. In response to these demonstrable falsehoods, a South Carolina court sua sponte ordered that all future pleadings be verified under oath by the highest-ranking corporate officer **(Ex. P)**. Rather than subject himself to this scrutiny, Shoffner settled the litigation **(Ex. W)**. Internal communications reveal Shoffner's attempt to manipulate the judicial process, proposing to coordinate with an adversary to "work together hitting Conrad from two angles" while seeking "complete indemnification" **(Ex. Q)**—conduct revealing a strategy of deception and obstruction, not good-faith litigation.

99. This pattern of deception extended beyond the courtroom. In 2019, Shoffner personally signed a Washington State Consent Order **(Ex. D)** resolving regulatory findings that his business practices violated the Business Opportunity Fraud Act and agreeing to cease and desist from those practices under threat of criminal enforcement. Despite this formal notice, Shoffner deployed the same fraudulent tactics against Plaintiff in 2024. Separately, Shoffner's business partner swore under oath that Shoffner knew the business model was built on misappropriated trade secrets **(Ex. V)**, a sworn admission that shatters any façade of legitimacy.

100. A federal court, analyzing this very conduct, found prima facie evidence that Shoffner exercises "complete control" over his entities such that they have "no separate mind, will, or existence of their own" **(Ex. R)**. Despite this judicial finding, Shoffner continues to hide behind the corporate forms he perjured himself to create. **(Ex. F)**.

101. These sworn misrepresentations, detailed in **Exhibit F**, were not minor errors; they were a systematic campaign to obscure his enterprise's structure. As detailed in **Exhibit F**, Shoffner's false statements regarding formation dates, operational status, and asset transfers served the singular purpose of evading judicial scrutiny. This conduct was so

egregious it provoked a court order for verified pleadings—an order Shoffner sidestepped by paying to settle the case **(Ex. W)**.

102. This documented pattern of federal perjury destroys Defendant Shoffner's credibility. A man who lies under oath to a federal judge to conceal a stolen business system has no claim to truthfulness in any forum. His sworn statements are inherently unreliable.

103. Each false statement was materially designed to defeat personal jurisdiction and prevent the court from uncovering his fraud. Official state records contradict every key assertion in his sworn affidavit **(Ex. F, S)**. This willingness to commit perjury is not a relic of 2015; it is the proven character of the man who recruited Plaintiff in 2024, as the following facts demonstrate.

## VII. THE 2019 CONSENT ORDER: FORMAL REGULATORY FINDINGS, NOTICE, AND WILLFUL RECIDIVISM:

104. In December 2019, the Washington State Department of Financial Institutions concluded a formal regulatory investigation into the business practices of Defendant Shoffner's enterprise and issued a Consent Order resolving regulatory findings under Washington's Business Opportunity Fraud Act.

105. Defendant Shoffner personally executed the Consent Order (Ex. D), thereby agreeing to be bound by its findings, remedies, and cease-and-desist obligations, without admitting or denying the underlying allegations:

106. The Consent Order identified and resolved regulatory findings that the enterprise engaged in the following prohibited practices:
(a) operating an unregistered business opportunity;
(b) making earnings claims without a disclosed basis;
(c) failing to provide required disclosures to purchasers; and
(d) failing to provide disclosure documents prior to accepting payment.
As part of the Consent Order, Shoffner agreed to reimburse $5,000 in investigative costs.

107.   The Consent Order explicitly warned Shoffner that "WILLFUL VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE."

108.   Five years later, in 2024, Defendant Shoffner employed the same core tactics—unregistered business opportunity offerings, undisclosed earnings claims, and failure to provide required pre-payment disclosures—against Plaintiff in Texas. This post-Order conduct demonstrates the knowing and willful nature of Shoffner's actions against Plaintiff.

109.   The Washington Consent Order establishes Shoffner's personal knowledge, as of 2019, that the specific business practices he used had been formally identified by regulators as unlawful under state law. When Shoffner recruited Plaintiff in 2024, he did so with the awareness that these identical tactics had been formally deemed unlawful and could trigger criminal liability.

110.   The business practices identified and resolved in the Washington Consent Order—operating an unregistered business opportunity, making unsubstantiated earnings claims, and concealing material disclosures—constitute direct violations of parallel federal and Texas statutes, including the FTC Franchise Rule (16 C.F.R. § 436) and the Texas Business Opportunity Act (Tex. Bus. & Com. Code §§ 51.001 et seq.).

111.   Plaintiff is informed and believes, and thereon alleges, that the unlawful conduct described herein has been directed by Defendant Shoffner at other dealers across the United States, creating a class of similarly situated victims recruited and exploited through this repeated, known-fraudulent scheme.

## VIII. THE 2024 FRAUD AGAINST PLAINTIFF: THE SCHEME COMES TO TEXAS

112.   In early 2024, Defendant Shoffner, through his enterprise, recruited Plaintiff James De Los Santos in Austin, Texas. During recruitment calls, Shoffner's agents explicitly told Plaintiff he could sell mattresses at "50–80% off" retail prices, a claim central to the recruitment pitch. Shoffner's business materials and agents made additional representations: that Plaintiff would "be his own boss," "own his own business," could

29

"earn up to $150,000 per year" through a "proven business model" with "low overhead," and could "set his own hours" **(Ex. DD)**.

113. These were not offhand remarks but calculated, scripted representations that Shoffner personally developed and controlled. As he has admitted under oath, Shoffner writes recruitment scripts, approves marketing, and directs disclosures **(Ex. J)**. These representations were knowingly false, based on Shoffner's fifteen-year operation of the same deceptive system.

114. Defendant Shoffner owed Plaintiff, as a prospective purchaser of a business opportunity, a fiduciary-like duty of candor and a statutory duty under federal and Texas law to disclose all material facts. Shoffner knowingly and systematically breached these duties by concealing the following material facts:

115. (a) The 2009 Ohio judgment **(Ex. G)** establishing the business model was adjudicated stolen trade secret property;

116. (b) His own knowing acquisition and financing of that stolen system from 2009–2014, confirmed by his sworn admission **(Ex. H)** and his partner's affidavit **(Ex. V)**;

117. (c) His 2015 perjury in federal court **(Ex. F, I)** regarding his corporate control, which prompted a court order for verified pleadings **(Ex. P)**—an order he evaded by settlement **(Ex. W)**;

118. (d) The 2019 Washington State Consent Order **(Ex. D)**, in which Defendant Shoffner personally executed a regulatory order resolving findings that his business practices violated the Business Opportunity Fraud Act and agreed to cease and desist from those practices under threat of criminal enforcement—yet nonetheless deployed the same deceptive tactics against Plaintiff in 2024; and

119. (e) The undisclosed franchise-level control he would exert—mandating exclusive suppliers, financing partners, and approving all key decisions—control a federal court has found makes his corporate entity a mere alter ego **(Ex. R)**.

120. Each concealed fact was material. No reasonable person, knowing the model was built on stolen secrets, that its operator was a perjurer and admitted fraudster, and that promised independence was a fiction, would have invested $150,000 and left stable employment. Shoffner's concealment constitutes fraudulent inducement.

## IX. THE 2024 SCHEME: SYSTEMATIC CONCEALMENT, THE "BINDER" MECHANISM, AND LEASE-INDUCED FINANCIAL ENTRAPMENT

### A. The 35-Day Communication Blackout and the Lease-Induced Financial Commitment

121. From August 27 through October 1, 2024, Defendant Shoffner's agent, Tim Heatley, engaged Plaintiff in an intensive, one-sided approval process comprising approximately 300 text messages and dozens of emails. These communications were not advisory or exploratory; they operated as a controlled funnel. Defendant Shoffner issued sequential directives—locate property, form an LLC, negotiate and execute a lease—Plaintiff complied, Defendant Shoffner conditioned all forward movement on his "corporate approval." Across this entire 35-day period and the volume of communications exchanged, Defendants never mentioned the existence of a "Dealer Agreement," never directed Plaintiff to review any governing contractual terms, and never disclosed that a comprehensive written agreement would control Plaintiff's rights and obligations **(Ex. Y, Z)**.

122. Defendant Shoffner positioned execution of a commercial lease as the final prerequisite to approval. Heatley expressly instructed Plaintiff: "DO NOT SIGN A LEASE UNTIL APPROVED AND INSTRUCTED!" **(Ex. Z, pp. 23–25)**. After dictating lease parameters and granting final approval, Plaintiff executed a binding commercial lease on or about October 1, 2024. This execution imposed substantial, irreversible financial obligations and materially constrained Plaintiff's ability to withdraw once additional terms were later presented without severe economic harm.

### B. The Physical Concealment Mechanism: The "Binder" Structure

123. Concurrent with this procedural sequence, Defendants implemented a physical concealment mechanism through the standardized "Dealer Success Kit" binder.

31

124. When opened in the ordinary course, the binder presents five clearly labeled, forward-facing tabs: Welcome, Getting Started, New Dealer Checklist, Real Estate Guide, and Brand Guidelines. The operative Dealer Agreement—containing the arbitration clause, delegation provision, exclusive dealing mandates, and termination authority—was placed behind a sixth tab labeled "Reference Documents," physically positioned behind all five primary tabs.

125. A reasonable person reviewing the binder would not discover this section through ordinary review. The label "Reference Documents" conveys the appearance of supplementary or non-binding materials rather than a governing contract. The arbitration and delegation provisions appear on pages 13–14 of the Dealer Agreement, corresponding to pages 83–84 of the binder, deep within the concealed section **(Ex. BB, HH)**.

126. This physical concealment was compounded by complete communicative silence. At no point did any MBA representative inform Plaintiff that the binder contained a binding agreement, direct him to the "Reference Documents" section, or advise him to seek legal review. All contemporaneous communications remained focused on operational execution and financial milestones **(Ex. Y, Z)**.

**C. The Contradictory "Kit" Timeline and Post-Hoc Narrative**

127. In subsequent arbitration proceedings, Defendant Shoffner's General Counsel, David Shiroff, submitted a sworn declaration asserting that the "New Dealer Success Kit" was mailed on August 28, 2024. Defendants' own contemporaneous records materially contradict this assertion.

128. Defendant Shoffner's "LEGAL STUFF" email **(Ex. Z, pp. 11–13)** contains no reference to any contract or binder. On October 1, 2024, at 2:05 PM—minutes before transmitting the DocuSign document—Heatley emailed Plaintiff stating that a "Success Kit" was forthcoming via FedEx and instructed Plaintiff to notify him if it was not received. This communication indicates Defendants did not believe Plaintiff already possessed the kit at the time of execution.

129. A post-contract text message dated October 3 reflects that a package had been sent to an incorrect address and would require re-sending **(Ex. Y, p. 29)**. Plaintiff had vacated his prior residence on September 7, 2024. Any package allegedly mailed in August would not have been deliverable to Plaintiff.

130. The concealment was effective. Plaintiff did not discover the Dealer Agreement until January 28, 2026—more than sixteen months later—and only after Shiroff's declaration prompted a forensic review. Plaintiff's prior statements that he never received the agreement "in writing" were accurate.

**D. Waiver and Judicial Estoppel**

131. During the prior declaratory judgment proceeding—where Plaintiff repeatedly testified that he "never saw the contract"—Defendants did not assert that the agreement had been mailed in August, did not produce shipping records, and did not contend that Plaintiff had "weeks to review" the document. Defendants relied exclusively on the DocuSign instrument.

132. Only after Plaintiff challenged arbitration jurisdiction under AAA Rules R-7 and R-9 did Defendants advance, for the first time, the "kit" narrative **(Ex. FF)**. Defendants' failure to raise this alleged disclosure in the earlier judicial proceeding—where it would have been directly responsive to Plaintiff's claims—supports application of waiver and judicial estoppel principles.

**E. Concealment of Arbitration and Delegation Provisions as Part of the Anticompetitive Scheme**

133. The Dealer Agreement was not merely undisclosed—it was structured to evade discovery. All purported contractual provisions were placed at the very back of the Dealer Success Kit, as the final printed materials in the binder, behind multiple unrelated tabs. The arbitration and delegation provisions appeared on pages 13–14 of the Dealer Agreement, corresponding to pages 83–84 of the physical binder—far removed from any section a reasonable dealer would identify as a governing contract **(Ex. BB, HH)**.

134. Defendants will characterize the contents of the binder as "confidential," "proprietary," or "trade secret." That characterization is unfounded. Plaintiff is willing to submit the entire binder to the Court for in camera review. As Plaintiff stated consistently from the moment the document was later uncovered, he briefly reviewed the opening pages and determined the materials were largely operational, generic, and duplicative of information already available to him through MBA's online dealer portal. There was nothing in the binder that reasonably signaled the presence of binding legal terms, much less an arbitration or delegation clause.

135. The placement of all contractual provisions as the final, buried component of the binder—under a tab labeled "Reference Documents"—was not accidental. It ensured that arbitration and delegation clauses would remain undiscovered while Plaintiff was being directed, through constant email and text communications, to commit capital, execute a lease, and place inventory orders. The concealment of dispute-resolution provisions operated in tandem with Defendants' exclusive dealing and termination threats to fragment accountability and suppress collective dealer action.

136. This method of concealment is consistent with the broader anticompetitive scheme alleged herein: isolate dealers, prevent coordinated resistance, and ensure disputes are fragmented, delayed, or diverted before they can be examined by a court.

## F. Consciousness of Guilt and Pattern of Conduct

137. After terminating Plaintiff, Defendants demanded return of the physical "Dealer Success Kit" binder **(Ex. CC)**. If the binder contained only routine or replaceable materials, Defendants could have provided copies or digital replacements. Instead, Defendants insisted on retrieval of the original physical object.

138. That demand supports a reasonable inference that Defendants understood the evidentiary significance of the binder's structure and contents—specifically, that its organization and placement of materials reflected deliberate concealment of material terms.

139. This conduct is consistent with Defendant Shoffner's established pattern of inducing financial commitment prior to disclosure of governing terms, as documented in the 2019

Washington State Consent Order **(Ex. D)**. The binder retrieval demand thus corroborates Plaintiff's allegations of intentional concealment rather than inadvertence or oversight.

**G. Conclusion: The Contract as Evidence of Fraud, Not the Basis of the Claims**

140. Plaintiff brings this action under the Sherman Act and related statutes based on a documented scheme of fraud and anticompetitive conduct. The claims asserted herein rise or fall on the evidence of that scheme—not on the enforcement, interpretation, or validity of any contract. Plaintiff references the concealed "Dealer Agreement" solely as evidence of Defendants' deceptive practices and anticompetitive design.

141. Fraud, by its nature, creates informational asymmetry. The fact that Defendants succeeded for a time in concealing material terms is not a weakness of Plaintiff's claims; it is proof of the scheme alleged. Plaintiff does not ask this Court to accept conclusions or rhetoric. Plaintiff asks only that the Court examine the evidentiary record assembled under the standards of the Sherman Act and related federal law.

142. Plaintiff is not judge or jury. Plaintiff is a citizen who uncovered a pattern of conduct spanning decades and now invokes the authority of this Court to assess that record, apply the governing law, and determine whether Defendants' conduct violates statutes enacted to protect the public interest. Plaintiff submits this evidence in good faith and stands ready to prove the claims alleged.

## X. THE CONTRACT AS EVIDENCE OF THE ANTICOMPETITIVE AND FRAUDULENT SCHEME

143. Plaintiff's claims are independent torts and statutory violations. This section addresses the contract not as the source of claims, but as documentary proof of Defendant Shoffner's anticompetitive and fraudulent scheme. Plaintiff anticipates Shoffner will hide behind contractual provisions to evade liability. The contract itself disproves his defense, proving:

144. (a) The exclusive dealing restraints are per se illegal under the Sherman and Clayton Acts;

145.   (b) The arrangement constitutes an unregistered franchise in violation of the FTC Franchise Rule and Texas Business Opportunity Act, rendering it void ab initio;

146.   (c) Shoffner cannot invoke defenses (arbitration, forum selection) from a contract void due to his own fraud; and

147.   (d) The contract's terms, if examined, affirm rather than negate Plaintiff's antitrust and fraud claims.

148.   As established, federal courts have found Shoffner exercises "complete control" over his corporate entities **(Ex. R)**. He cannot claim alter-ego immunity from liability while simultaneously invoking corporate contractual protections. The provisions below are presented as evidence of the scheme, not as the basis for Plaintiff's claims.

**A. The Exclusive Dealing Provision**

149.   Section 3.1 of the Dealer Agreement, drafted and enforced by Defendant Shoffner, states in its entirety:

150.   *3.1 MBA has carefully selected the Products it offers to dealers and has established and built value and substantial goodwill in its brand and business system for Dealer, as well as for other MBA dealers, based on its considered selection of Products. To maintain its brand and the integrity and value of the MBA dealership to Dealer and to other MBA dealers, Dealer's MBA dealership shall be limited to the brands, product selection (including types of goods sold), and suppliers that MBA offers to dealers, and no others. Dealer agrees not to sell, offer to sell, market, advertise, or display any Product or product (for example, furniture or appliances) not approved in advance in writing by MBA. A list of MBA-approved Products and suppliers, which may be updated from time-to-time, is located on MBA's website. Dealer recognizes the value and goodwill of MBA's business system and MBA's relationships with its product manufacturers and agrees that the limitation of Products to those selected by MBA is necessary to protect value and goodwill in MBA's brand, in the MBA system, and in MBA dealerships. Dealer agrees that Dealer shall purchase its full requirements for Products solely and exclusively*

36

*through MBA, unless approved in writing and in advance by MBA. MBA reserves the right to add or delete Products, based on its sole discretion, from time to time.*

This provision constitutes an unlawful exclusive dealing arrangement in violation of Section 1 of the Sherman Act, per se or, at minimum, unlawful under the rule of reason, as it forecloses competition and lacks any legitimate pro-competitive justification **(Ex. HH)**.

### B. Factual Application Proving Anticompetitive Foreclosure

151.    In practice, Shoffner enforced this provision to create a captive market:

152.    (a) **Restricted Product Access** – The contract confines the dealer exclusively to Defendant Shoffner's pre-selected brands and suppliers. As evidenced by Shoffner's own marketing materials **(Ex. DD)**, reflecting brands such as 3Z Brands, Sealy, Brooklyn Bedding, Malouf, etc., Plaintiff was limited to this curated list.

153.    (b) **Inadequate and Non-Competitive Allocation** – Despite the listed brands having multiple product lines, Plaintiff's actual purchasing access was severely restricted. Plaintiff was permitted to order only one mattress line from Sherwood (comprising 10 models) and certain accessories from Malouf **(Ex. B, C)**.

154.    (c) **Formal Requests for Competitive Product Denied** – Plaintiff made repeated, documented requests to Defendant Shoffner's management, including Katie Hein (Head of New Dealer Training) and Keith Mackey (Chief Officer), for access to additional, higher-quality mattress lines to compete effectively in the Austin market. These requests were denied as "against policy." A follow-up legal inquiry to in-house counsel David Shiroff on March 5, 2025 went unanswered **(Ex. A)**.

155.    (d) **Illegal Tying Arrangement** – Defendant Shoffner explicitly tied the promise of expanded product access (a "one more line") to an arbitrary purchasing quota, demanding Plaintiff first buy $50,000 in existing inventory. This forced purchase of unwanted, non-competitive stock was a condition for potentially gaining market-viable products. This constitutes an illegal tying arrangement under Sherman Act § 1.

156.    (e) **Material Misrepresentation – The "Bait and Switch" Admission** – During a coaching call, agent acting under Defendant Shoffner's direction Katie Hein admitted to Plaintiff that Shoffner's advertised promise of selling mattresses at "50–80 percent off" was not genuine and was merely "a hook." Plaintiff told her he felt trapped. When you lie to a customer, it costs them a few hundred dollars; when you lie to a dealer, you cost them their livelihood. This admission, documented in **Exhibit E**, proves the core pricing model was fraudulent inducement.

## C. The Ambiguity of Section 3.1 Proves Anticompetitive Intent Regardless of Interpretation

157.    Section 3.1's language is deliberately ambiguous, stating Plaintiff is "limited to the brands, product selection... that MBA offers to dealers" with "a list of MBA-approved Products and suppliers... located on MBA's website." This provision operates as an antitrust violation under either possible interpretation:

158.    (a) **Narrow Interpretation (What Shoffner Actually Delivered):** If Section 3.1 is read to permit Defendant Shoffner to unilaterally restrict Plaintiff to a subset of the brands shown on the website, then Shoffner breached the contract by limiting Plaintiff to only one Sherwood line (10 models) despite the website displaying seven available brands: Diamond Mattress, Brooklyn Bedding, Beautyrest, Simmons, Sherwood Bedding, Malouf, and Lunessence (see **Ex. DD**, website screenshot dated 2/5/26 showing "OUR BRANDS" section). Moreover, this interpretation renders the "approved list on the website" language meaningless, as Shoffner could arbitrarily deny access to listed brands while enforcing absolute exclusivity—proving the clause serves only to trap dealers with illusory choice while maintaining anticompetitive foreclosure.

159.    (b) **Broad Interpretation (Mandatory Exclusivity to All Listed Brands):** If Section 3.1 is read to require exclusive dealing with all brands shown on the website, then the provision is a per se illegal exclusive dealing arrangement under Sherman Act § 1 that forecloses Plaintiff from accessing any competitive suppliers not on Shoffner's curated list. The fact that Shoffner controls which brands appear on "MBA's website" means he

unilaterally dictates the entire scope of Plaintiff's purchasing options—textbook anticompetitive market allocation.

160.   (c) **The Deliberate Ambiguity Is the Proof.** The vagueness of Section 3.1 is not accidental. It is deliberately designed to give Defendant Shoffner complete discretion to enforce exclusivity while evading scrutiny. Under either interpretation, the provision forecloses Plaintiff from competitive suppliers in violation of antitrust law, gives Shoffner unilateral control over which products Plaintiff may sell—franchise-level control concealed as an "independent dealership"—and operates as a trap in which Plaintiff cannot access the brands advertised on the website under a narrow reading, yet is simultaneously prohibited from sourcing products from any alternative supplier under a broad reading.

161.   This structural ambiguity, combined with Defendant Shoffner's documented denial of Plaintiff's requests for additional brands "as against policy," demonstrates that the exclusive dealing clause serves no legitimate business purpose and exists solely to maintain captive revenue streams for Sherwood Southwest and CVB Inc./Malouf.

162.   (d) **The "50–80% Off" Fraudulent Pricing Claim on the Same Website:** The same website that displays the seven brands also prominently advertises "SIGNIFICANT SAVINGS: Up to 50–80% OFF Traditional Retail Prices!" (see **Ex. DD**). As detailed in ¶156, Defendant Shoffner's agent Katie Hein admitted to Plaintiff that this pricing claim was not genuine and was merely "a hook" to attract dealers **(Ex. E)**. The fact that this fraudulent pricing claim appears on the same website page as the brand list demonstrates that the entire "website list" representation is part of a coordinated scheme of fraudulent inducement: the website displays attractive brands and pricing to recruit dealers, but the reality is restricted access and fraudulent pricing—all designed to trap dealers in an exclusive dealing arrangement they would never have entered with full disclosure.

**D. Enforcing Exclusivity Amid Supply Failure**

163.   Defendant Shoffner's Failure to Supply Contractually Promised Products While Enforcing Absolute Exclusivity

39

164.    (a) **Inability to Source Essential Products** – From the inception of the dealership, Defendant Shoffner's approved supplier Malouf was consistently out of stock of core accessories Plaintiff was contractually entitled to sell. Plaintiff documented this supply failure through repeated emails and calls to Malouf, Shoffner's representatives, and his assigned coach **(Ex. A)**.

165.    (b) **Denial of Alternative Sourcing** – In response to this critical shortage, Plaintiff requested permission to source equivalent accessories from an alternate supplier, such as Amazon, to maintain necessary revenue. Defendant Shoffner, through his agent and assigned coach "Joe," denied this request via text message **(Ex. A)**, insisting Plaintiff adhere to Section 3.1 and purchase only from the approved list—specifically directing Plaintiff to "buy more box springs"—despite Shoffner's own designated supplier's inability to fulfill supply of the accessories Plaintiff actually needed. This absurd directive proves the exclusive dealing arrangement had no legitimate business justification and served only to maintain absolute market foreclosure.

166.    (c) **Coercive Financial Impact** – Defendant Shoffner's own training emphasized that accessory sales were essential for dealer profitability. By failing to supply the products while enforcing exclusivity, Defendant Shoffner actively prevented Plaintiff from generating this vital revenue stream, exacerbating the financial hardship caused by the non-competitive mattress selection.

(d) **Acknowledgement Without Remedy** – Malouf representative Dale Burnett acknowledged the persistent supply issue over several months, offering apologies but no solution. When Plaintiff expressed frustration with Defendant Shoffner's policy preventing a remedy, Burnett responded, "Just stick with MBA's plan, they have been around for a while and know what they are doing, I am sorry." This exchange underscores the absolute market foreclosure imposed by Defendant Shoffner's exclusive dealing arrangement: even when the approved system failed, the dealer was barred from seeking alternatives. This demonstrates that the exclusive dealing arrangement had no legitimate business justification and served only to ensure captive revenue streams for Sherwood Southwest and CVB Inc./Malouf.

**E. Illusory "Support" as Evidence of Fraudulent Inducement and Deliberate Deception**

167. Plaintiff's substantial upfront investment was made in reliance on Defendant Shoffner's representations that he was purchasing a business opportunity inclusive of training, coaching, and a proven support system to ensure his success as an independent dealer. In practice, the promised "support" constituted none of the good faith business mentoring implied. Instead, Defendant Shoffner's "coaches" served as compliance officers for the restrictive system, and his designated suppliers (Sherwood, Malouf) and financier (Koalafi) operated as captive revenue channels within a closed loop of control.

168. The coaching team's primary functions were to:

   (a)   Enforce exclusive dealing requirements with threats of termination, ensuring purchases flowed only to Shoffner's designated co-conspirators, Sherwood Southwest and CVB Inc./Malouf;

   (b)   Mandate participation in a fraudulent "bait and switch" sales scheme, explicitly describing products as "bait" **(Ex. E)**;

   (c)   Deny reasonable requests to solve operational crises—such as chronic inventory shortages caused by Malouf's failures—by refusing permission to source from available competitors **(Ex. A)**; and

   (d)   Provide scripted, non-responsive answers when confronted with the system's failures, ultimately disengaging when presented with legal concerns **(Ex. A)**.

169. **The Fraudulent "Hook" Admission by Shoffner's Head of Coaching.** The fraudulent nature of the entire model was confirmed from the top of Shoffner's operational team. In January 2025, after months of Plaintiff's frustration that the advertised "50–80% off" pricing model was not generating sales, Katie Hein—Defendant Shoffner's Head of Dealer Coaching—pressured Plaintiff to work harder, implying his struggles were due to a lack of effort. She explicitly stated that most dealers "only have $20k to invest" and are "forced to work hard to make it work no matter what," revealing the enterprise's design to target financially vulnerable recruits.

170. The deceptive nature of the pricing model was explicitly confirmed the following month. In February 2025, Katie Hein finally confessed the truth: the central "50–80% off" pricing claim was not a legitimate discount but a fraudulent "hook." This admission proved that the primary promise inducing Plaintiff's investment—the heart of Shoffner's nationwide marketing—was a deliberate deception used to recruit dealers and lure customers, exactly as documented by the fake "sold out" discounts and fabricated MSRPs in **Exhibit E**.

171. This so-called "support" structure—culminating in the admission of the fraudulent "hook"—had no legitimate business purpose to aid the Dealer. Its purpose was to maintain the dealer as a captive purchaser within Defendant Shoffner's controlled system, ensuring the flow of revenue to Shoffner and his co-conspirators (Sherwood, Malouf, Koalafi) while offloading all inventory risk and operational costs onto the Dealer. Therefore, a core component of the transaction as marketed—the provision of good faith operational support and training—was illusory and fraudulent. The Dealer paid for the right to be controlled and defrauded, not supported. This failure of consideration and fraudulent inducement permeates the entire agreement and reinforces its use as an instrument of anticompetitive restraint, not lawful commerce.

**F. Deliberate Non-Response as Evidence of Intent**

172. Defendant Shoffner's Pattern of Deliberate Non-Response as Evidence of Intentional Fraud (Ex. A)

173. When confronted with the failures of his system, Defendant Shoffner, through agents acting under his direction, adopted a deliberate strategy of silence and disengagement designed to:

174. (a) Avoid creating a discoverable record of the restrictive practices;

175. (b) Prevent Plaintiff from finding lawful ways to mitigate the harm caused by Shoffner's own supply chain failures;

176. (c) Force Plaintiff into compliance through uncertainty and operational desperation; and

177.   (d) Maintain the exclusive dealing arrangement despite its manifest failure to deliver the promised benefits.

178.   When Plaintiff sent a detailed legal inquiry on March 5, 2025, seeking written clarification of the restrictive policies **(Ex. A)**, Defendant Shoffner's in-house counsel refused to engage, stating it "would not serve the interests of MBA." This refusal to provide clarity—combined with the systematic disengagement strategy ("myself and David will be disengaging at this point")—was not inadvertent. It was a deliberate tactic to keep Plaintiff bound to an oppressive arrangement while preventing him from documenting the fraud and antitrust violations. This pattern of deliberate silence constitutes evidence of consciousness of guilt and intentional fraud. Furthermore, his history of admissions under oath is starkly contrasted by his pattern of materially false sworn statements to federal court, documented in Exhibit F.

**G. The Contract Is an Unregistered, Void Franchise**

179.   **Federal and State Franchise/Business Opportunity Law Violations**

180.   **Not Used.**

181.   (a) **Defendant Shoffner's System Constitutes an Unregistered Franchise** – Despite Section 1.3's disclaimer that "Nothing in this Agreement is intended to create a franchise," Defendant Shoffner's system meets all three elements of a franchise under the FTC Franchise Rule (16 CFR Part 436) **(Ex. HH)**:

182.   (i) Trademark authorization (Sections 2.1, 2.2, 5.1; Shoffner controlled Google/Facebook pages);

183.   (ii) Prescribed operating system (Sections 3.1, 4.1, 4.2, 4.3, 5.1, 5.2; mandatory scripts, purchasing, advertising, and layout controls); and

184.   (iii) Required payment (territory fee, mandatory inventory purchases, ongoing "freight and delivery fees" that are Shoffner's personal markup).

185.   (b) **FTC Franchise Rule Violations** – Defendant Shoffner violated 16 CFR § 436.2(a) by failing to provide a Franchise Disclosure Document at least 14 days before Plaintiff

made any payment or signed any binding agreement, and by conditioning delivery of the Dealer Agreement on financial commitments **(Ex. Z)**: "Make sure you have $20K to invest … You will get the dealer agreement upon submitting a lease and mandatory order."

186.    (c) **Texas Business Opportunity Act Violations** – Defendant Shoffner violated Tex. Bus. & Com. Code §§ 51.001 et seq. by failing to register as a business opportunity and by failing to provide the required disclosure document at least 10 business days before Plaintiff signed or paid. Under § 51.007(a), these violations render the Dealer Agreement void and entitle Plaintiff to rescission, recovery of all payments, attorneys' fees, and civil penalties.

187.    (d) **Legal Effect: Contract Void Ab Initio** – Defendant Shoffner's concealment of the franchise characteristics, combined with systematic failure to comply with mandatory federal and state disclosure requirements, prevented informed consent and constitutes fraud in the factum.

188.    Defendant Shoffner required Plaintiff to commit to over $97,000 in financial obligations—including a $299 territory fee, a two-year commercial lease totaling $73,800 (executed September 30, 2024), a $3,150 lease deposit, and $20,000 in mandatory inventory purchases **(Ex. BB)**—before providing the Dealer Agreement for review, engineering irreversible financial commitments while the governing terms remained concealed. Defendants' territorial representations and enforcement practices are further documented in historical territory agreements (Ex. U)

189.    The Dealer Agreement is therefore void from its inception and unenforceable, including any arbitration or forum selection clauses contained therein. Defendant Shoffner cannot invoke contractual defenses from a contract that is legally nonexistent due to his own fraud and statutory violations.

## XI. SYSTEMATIC CONCEALMENT, FINANCIAL ENTRAPMENT, AND THE BAIT-AND-SWITCH SCHEME (2024)

### A. The Concealment and Financial Trap

44

190. Defendant Shoffner executed a deliberate, multi-layered scheme to extract substantial financial commitments from Plaintiff while concealing the material terms governing the relationship.

191. First, Defendant Shoffner physically concealed the governing Dealer Agreement within a "Dealer Success Kit" binder mailed to Plaintiff in late August or early September 2024. The Agreement was placed behind five front tabs in a final section labeled "Reference Documents"—not "Contract," "Dealer Agreement," or any similar designation indicating legal significance. The arbitration and delegation provisions were buried on pages 83–84 of the document without signature lines, highlighting, or any visual cue indicating their importance **(Ex. BB, HH)**.

192. Second, during the entire 35-day recruitment and setup period, Defendant Shoffner's agents directed all communications toward operational tasks and financial milestones while never mentioning the existence, location, or content of the Dealer Agreement. Pre-contract communications submitted as **Exhibit Z** contain no reference to the agreement, no instruction to review it, and no identification of where it could be found.

193. Third, Defendant Shoffner required Plaintiff to incur substantial, irreversible financial obligations before Plaintiff could reasonably discover or review the concealed agreement. On September 30, 2024, Plaintiff was directed to execute a commercial lease committing him to $73,800 in rent obligations. Immediately thereafter, Plaintiff was required to place mandatory, exclusive inventory orders exceeding $92,500 **(Ex. BB)**. These financial commitments were engineered to occur before Plaintiff had any meaningful opportunity to locate or understand the governing contractual terms.

**B. The "Consent to Be Bound" Clause: Weaponizing Signatures Obtained Without Informed Consent**

194. The Dealer Agreement contained a provision requiring that family members and employees of the dealer sign a "consent to be bound" by the Agreement's terms **(Ex. HH)**. This provision was not separately disclosed, not explained, and not identified during onboarding. It was buried within the same concealed Agreement that Plaintiff himself did not discover until January 28, 2026.

195. On or about October 1, 2024, Plaintiff completed the DocuSign process on a computer. The electronic signing interface presented a series of signature fields with a "skip to next signature" button. Plaintiff signed in good faith, believing he was completing standard onboarding paperwork. At no point during the DocuSign process were the terms of the Dealer Agreement displayed, nor was Plaintiff directed to review arbitration, delegation, or "consent to be bound" provisions. Plaintiff never saw a contract. He saw a sequence of electronic signature prompts.

196. Approximately four and a half hours later, Plaintiff's brother, Anthony De Los Santos, received a separate DocuSign email and signed it. Anthony is not an owner or member of Procreate LLC. He is a W-2 employee whom Plaintiff had hired to help operate the mattress showroom. Anthony had no involvement in recruitment, no communication with Defendant Shoffner's agents, no knowledge of the Dealer Agreement's existence or terms, and no understanding of what he was signing. He signed because his brother had started a new business and sent him paperwork. He was consenting to be "bound" by a contract that neither he nor Plaintiff had ever been shown.

197. Defendants subsequently used Anthony's electronic signature to add him as a named Respondent in AAA arbitration proceedings seeking $299,000. Defendants' counsel, Kevin Cook and Matthew Goller, then sent written correspondence to Plaintiff stating that Plaintiff could not speak on behalf of Anthony in the arbitration. Simultaneously, the arbitrator issued Order No. 3 requiring Procreate LLC to retain separate counsel, then issued Order No. 4 denying Procreate's request for a continuance to obtain that counsel. The combined effect was deliberate: Plaintiff was prohibited from speaking for his brother, prohibited from speaking for his LLC, and left as the sole voice defending three named Respondents against a $299,000 claim—with no counsel and no time to obtain any **(Ex. II)**.

198. When Anthony challenged his inclusion in the arbitration on the grounds that he did not knowingly consent to the Agreement's terms, Defendants' counsel responded that this objection was "ridiculous" because Anthony signed approximately five hours after Plaintiff and "could have just asked his brother for a copy." This argument is an admission of the fraud: Defendants contend Anthony should have requested a copy of a

document that Plaintiff himself had never been shown, had never been directed to review, and did not discover for sixteen months. The defense presupposes the existence of informed consent that Defendants' own concealment scheme was designed to prevent.

199. The treatment of Anthony stands in direct contrast to Defendants' conduct in the Williams arbitration, where the same counsel—Cook and Goller—permitted John Williams, a pro se individual, to speak for both himself and his LLC, Star 7 Venture LLC, without requiring separate corporate counsel. The differential treatment was not based on any rule or legal distinction. It was a tactical choice to isolate Plaintiff, silence Procreate, and manufacture Anthony's exposure—all to maximize pressure and deter participation.

200. The "consent to be bound" clause was not designed to obtain informed agreement from family members or employees. It was designed to harvest signatures from individuals who had no knowledge of the contract's terms, creating future litigation leverage that Defendants could deploy to fracture a dealer's defense, multiply the named parties, and impose insurmountable procedural burdens on pro se respondents. Anthony De Los Santos is a W-2 employee who checked his email hours after his brother signed onboarding paperwork. He is now a named respondent in a $299,000 arbitration. That is not consent. That is entrapment by design.

## C. The Concealment Worked for Sixteen Months

201. The concealment was effective for more than sixteen months. Plaintiff did not discover the Dealer Agreement until January 28, 2026, and only because Defendant Shoffner's own in-house counsel submitted a sworn declaration in arbitration asserting that the agreement had been mailed within the Dealer Success Kit.

202. Prompted by that sworn representation, Plaintiff conducted a forensic, page-by-page review of the binder to reconcile Defendants' claim. It was only through this exhaustive search—triggered by Defendants' own legal filing—that Plaintiff located the physically hidden agreement **(Ex. BB)**.

203.    Plaintiff's prior consistent statements that he never received the agreement "in writing" were accurate: no email, text, or instruction ever identified its existence or location (**Ex. Z**). The discovery confirms that the agreement was not merely undisclosed, but deliberately concealed to prevent informed consent while financial commitments were secured.

### D. The Reality: Total Control, No Independence

204.    Upon commencing operations, Plaintiff discovered that the promised independence did not exist. Defendant Shoffner exercised complete operational control over the dealership.

205.    Shoffner dictated advertising content, required use of prescribed sales scripts, mandated specific store layout and operational protocols, and required Plaintiff to use Shoffner-controlled Google and Facebook business pages—pages funded by Plaintiff through required advertising expenditures but not owned or controlled by him.

206.    Most critically, Plaintiff was informed by his assigned coach, acting under Defendant Shoffner's direction, that he was prohibited from sourcing products from any supplier other than those designated by Shoffner (**Ex. A**). This restriction was enforced with explicit threats of termination. Despite marketing materials showing access to multiple mattress brands (**Ex. DD**), Plaintiff was restricted to a single product line from a single manufacturer, Sherwood Bedding. Requests for access to other advertised suppliers or product lines were denied.

207.    When Plaintiff sought written clarification of these restrictions, Defendant Shoffner's Chief Sales Officer refused to provide documentation and directed Plaintiff to "refer to your agreement"—an agreement that remained concealed at the time (**Ex. A**).

### E. The Financial Trap: Shoffner's Guaranteed Markup

208.    The financial structure of the system ensured Defendant Shoffner's profit regardless of dealer success. Shoffner charged Plaintiff inflated wholesale prices padded by Shoffner's personal markup through related entities he controlled, leaving Plaintiff with unsustainably narrow margins (**Ex. C**).

209.    Shoffner bore no inventory risk and no operational expenses for Plaintiff's store. Plaintiff bore all financial risk, including rent, inventory, advertising, and operating costs. Mandatory exclusive purchasing at inflated prices combined with total operational control made dealer failure foreseeable while guaranteeing Shoffner's profit.

**F. The Documented Bait-and-Switch Consumer Fraud Scheme**

210.    Defendant Shoffner required dealers to participate in a systematic bait-and-switch sales scheme.

211.    Shoffner provided internal price sheets showing artificially inflated "Manufacturer's Suggested Retail Prices" (MSRPs) to justify advertising deep discounts. For example, a basic mattress was assigned a purported $799 MSRP to support advertising a "$150 clearance" or "closeout" price **(Ex. E)**.

212.    Critically, Shoffner's own supplier website listed these advertised "discount" models as permanently marked "SOLD OUT," confirming they were not intended for actual retail sale **(Ex. E)**. Despite this, dealers were instructed to advertise and display these products to attract customers.

213.    Coach David, acting under Defendant Shoffner's direction, explicitly instructed Plaintiff via text message that the "$150 mattress" was "for display only" and intended as "bait." Customers were then to be switched to higher-priced models, frequently financed through Koalafi at interest rates that significantly increased consumer cost **(Ex. E)**.

214.    This bait-and-switch tactic was not optional or isolated; it was a required component of the system.

**G. A Repeatable Pattern, Not a New Scheme**

215.    The mechanisms used against Plaintiff in 2024—concealment of governing terms, extraction of substantial financial commitments before disclosure, exclusive dealing enforced by threats, and mandatory bait-and-switch tactics—were not new.

216.    They are the same mechanisms Defendant Shoffner employed since acquiring control in 2014, misrepresented under oath in 2015 **(Ex. F, I)**, and admitted were unlawful in the

2019 Washington State Consent Order **(Ex. D)**. The 2024 conduct represents continuation of a long-standing, repeatable scheme.

**H. Retaliatory Financing Cutoff Following Plaintiff's Exit**

217. Defendant West Creek Financial, Inc. d/b/a Koalafi was operationally integrated into Defendant Shoffner's system. Its representative "Jay" was a regular participant in dealer coaching calls conducted under Shoffner's direction.

218. When Plaintiff informed Jay that he was exiting the Shoffner operation and requested a routine business-name update on his Koalafi merchant account—opened under Plaintiff's own name and EIN—Jay immediately threatened that the account would need to be closed if Plaintiff was no longer affiliated with Defendant Shoffner.

219. Months later, during active litigation against Defendant Shoffner, Plaintiff discovered without notice that his Koalafi account had been closed when a customer application was rejected. No explanation was provided despite repeated requests. In contrast, another financing company, Snap Finance, promptly corrected the same administrative request without issue, confirming the retaliatory nature of Koalafi's conduct.

220. The timing, threats, lack of explanation, and coordinated silence mirror Defendant Shoffner's own disengagement tactics **(Ex. A)** and support the inference that Koalafi acted in concert with Shoffner to punish Plaintiff's exit and deter others.

## XII. RELEVANT MARKET DEFINITION

221. The relevant product market is the wholesale supply of mattresses, bedding accessories, and related consumer financing services to independent and semi-independent retail mattress dealers operating in the State of Texas. This market includes manufacturers, distributors, and financing providers who compete to supply retail dealers with inventory and sales infrastructure.

222. The relevant geographic market is the State of Texas, where Plaintiff operated and where Defendants Sherwood Southwest and CVB Inc. maintain major manufacturing and distribution facilities within this District.

223. Defendants' own representations confirm this market definition. Defendant Shoffner's website—the same website incorporated by reference into the Dealer Agreement at Section 3.1—advertises access to eight distinct brands encompassing hundreds of product lines: Lunessence (10 series), Beautyrest (12 lines), Diamond Mattress (15+ lines), Brooklyn Bedding (15+ lines), Simmons (8+ lines), Sherwood Bedding (15+ lines), Tempur-Sealy (5 major brands with multiple lines each), and Malouf accessories— collectively representing well over two hundred individual product models **(Ex. DD)**. By advertising access to these competing brands, Defendant Shoffner acknowledged the existence of a competitive wholesale supply market and represented that dealers would participate in it.

224. In practice, Defendants foreclosed Plaintiff from this entire competitive market. Despite advertising eight brands and over two hundred product models, Defendants restricted Plaintiff to a single series (Forest Series) within a single brand (Lunessence), totaling just ten models—less than five percent of the product lines Defendants used to induce Plaintiff's $91,000 commitment. Lunessence is not even an independent brand; it is a private label manufactured by co-conspirator Sherwood Southwest, LLC, meaning Plaintiff's entire product offering was sourced from and controlled by a single captive supplier **(Ex. B, C)**.

225. Plaintiff repeatedly requested access to the additional advertised brands throughout his tenure as a dealer. Every request was denied as "against policy." These denied requests formed a central part of Plaintiff's good-faith complaint to Defendants seeking resolution **(Ex. A)**—the same complaint that triggered Defendant Shoffner's immediate retaliatory termination. Plaintiff was simultaneously prohibited from sourcing any product from any supplier not designated by Defendant Shoffner, including products as basic as thirty-dollar display bed frames, under threat of immediate termination.

226. The anticompetitive effect of this foreclosure is measured not against the universe of all retail goods, but against the wholesale supply market Defendants themselves defined through their own representations and contractual terms. Defendants advertised a competitive multi-brand marketplace, extracted substantial irreversible financial

commitments on that basis, delivered a single captive supplier, punished Plaintiff for asking why, and then terminated him for objecting.

227. This foreclosure was substantial. Plaintiff was denied access to one hundred percent of competing wholesale suppliers, one hundred percent of non-Sherwood mattress brands—including seven of the eight brands advertised on Defendants' own website and every series within Lunessence itself except one—and one hundred percent of non-Malouf accessory suppliers, even when Malouf was chronically unable to fulfill orders. The exclusive dealing arrangement eliminated all price competition, quality competition, and supply reliability competition that would exist in an unrestrained wholesale market, transferring all resulting surplus to Defendants while shifting all inventory risk and operational cost to Plaintiff.

## XIII. THE CONSPIRACY TO RESTRAIN TRADE: ENTERPRISE-WIDE EXCLUSIVE DEALING SYSTEM

### A. Exclusive Dealing with Defendant Sherwood Southwest

228. As a non-negotiable condition of participation in Defendant Shoffner's system, Plaintiff was required to purchase mattresses exclusively from Defendant Sherwood Southwest. This mandate was integral to Shoffner's controlled business model and barred dealers from sourcing products based on quality, price, or availability. Dealers were forced to sell Sherwood products at prices derived from Defendant Shoffner's fabricated MSRPs rather than market-based pricing **(Ex. E)**. This arrangement guaranteed Sherwood a captive customer base of dealers nationwide while foreclosing competition from other mattress manufacturers and suppliers. The arrangement was mutually profitable for the conspirators: Sherwood secured guaranteed bulk sales without competition, and Defendant Shoffner extracted a personal markup on each sale, as he has admitted under oath **(Ex. J)**.

### B. Documentary Proof of the Exclusive Dealing Conspiracy

229. On October 23, 2024, Defendant Shoffner personally sent Plaintiff an email titled "Opening Order selections." Attached was a spreadsheet titled "Revised Opening Order

Sherwood.xlsx" **(Ex. B, C)** containing purchasing options comprised solely of products from Sherwood Southwest and CVB Inc. d/b/a Malouf. This communication demonstrates that from the outset Defendant Shoffner controlled which suppliers' dealers were permitted to use, confined all purchasing options exclusively to designated co-conspirators, offered no alternative sourcing, and required substantial upfront purchases within the controlled supply chain.

230.    Before Plaintiff's store opened to the public, Plaintiff raised a logistical issue caused by Malouf's inability to supply sufficient bed frames for showroom display. Plaintiff asked only whether he could temporarily purchase low-cost bed frames, approximately $30, from Amazon for display purposes only and not for sale. In response, Plaintiff was explicitly told by his assigned coach "David," acting under Defendant Shoffner's direction, that sourcing any item from a non-designated supplier would result in termination of his dealership **(Ex. M)**. This threat was made before any sales occurred and before Plaintiff had violated any written policy, demonstrating enforcement through coercion rather than contractual compliance.

231.    The threats continued. In January 2025, after Plaintiff had already exceeded his planned inventory budget due to purchases directed by Defendant Shoffner, Plaintiff declined to place yet another inventory order due to financial constraints. Plaintiff's coach "Joe," acting under Shoffner's direction, warned Plaintiff that he could lose his store if he failed to order as instructed **(Ex. CC)**. These termination threats were issued in the absence of any contractual violation and within the first three months of Plaintiff's onboarding.

232.    During this same period, Plaintiff texted Coach Joe stating, "I just sold my last Queen Highrise, what do I do now? Can I order from Amazon?" Coach Joe responded "No" and instructed Plaintiff instead to order additional box springs from Malouf, the same approved supplier that had already failed to supply Plaintiff's inventory needs **(Ex. A)**. This exchange confirms that Defendant Shoffner enforced exclusive dealing even when doing so crippled dealer operations, prioritizing rigid supplier control over dealer viability.

53

233. On March 5, 2025, Plaintiff sent a detailed email to Defendant Shoffner's executives seeking written clarification of the verbal restrictions and termination threats, explicitly quoting communications from Coaches Joe and David **(Ex. A)**. Defendant Shoffner's in-house counsel refused to provide clarification, stating that doing so "would not serve the interests" of the operation, and executives disengaged. This coordinated refusal demonstrates a conscious strategy to enforce restrictive practices while avoiding the creation of a discoverable record.

234. Throughout Plaintiff's tenure, Defendant Shoffner refused all requests to allow alternative sourcing despite chronic and known failures by Malouf to fulfill orders. This refusal had no legitimate business justification and served only to preserve the captive customer base of Defendant Shoffner, Sherwood Southwest, and CVB Inc.

## C. The Co-Conspirators' Knowledge and Acquiescence as Agreement

The conspiracy alleged herein did not require a formal, signed agreement to restrain trade. An unlawful agreement can be inferred from a "course of dealing" or "conscious commitment to a common scheme." *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Defendants Sherwood Southwest, CVB Inc., and West Creek Financial (Koalafi) demonstrated their knowing participation and agreement through a consistent, interdependent course of conduct:

- **Integrated Operations:** They embedded their representatives (e.g., Malouf's Dale Burnett, Koalafi's "Jay") directly into Defendant Shoffner's dealer coaching and control apparatus, participating in calls where restrictive policies were enforced.

- **Acquiescence to Foreclosure:** They accepted the benefits of a system designed to eliminate competition. Sherwood and Malouf knew Shoffner's contracts forbade dealers from sourcing competing products. Their continued participation as the sole approved suppliers, despite chronic performance failures (by Malouf), demonstrates a conscious commitment to the exclusive dealing scheme.

- **Retaliatory Enforcement:** Koalafi's punitive account closure upon Plaintiff's exit from Shoffner's system was not a standard business practice but a

coordinated act of retaliation, mirroring Shoffner's own tactics and serving the conspiracy's goal of deterring dealer defection.

- **Willful Ignorance & Substantial Assistance:** Even if a co-conspirator claimed not to know the full extent of Shoffner's fraud, they had a duty to avoid facilitating it. By providing their products and financing as the exclusive, mandatory tools of a business model rife with fraudulent inducement and adjudicated theft, they provided "substantial assistance" to the scheme, incurring liability. *See, e.g., Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996).

### D. The Economic Rationality of the Conspiracy

The agreement is further evidenced by its economic logic. The scheme was mutually profitable and required each defendant's participation:

1. **For Shoffner:** Exclusive dealing created captive buyers, allowing him to extract personal markups and guarantee revenue while offloading all inventory risk onto dealers.

2. **For Sherwood Southwest & CVB Inc./Malouf:** They received guaranteed, foreclosure-protected sales to a national network of dealers, insulated from price and quality competition. Their failure to perform (Malouf's stockouts) did not threaten their market position because dealers were contractually barred from turning to competitors.

3. **For West Creek Financial (Koalafi):** It gained exclusive access to finance the sales within this closed loop, generating interest and fees from a trapped customer base, with the added enforcement power to punish dealers who left the system.

This interdependent, profit-driven structure itself is evidence of a "unity of purpose or a common design and understanding" to restrain trade. *American Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946).

### E. Enterprise-Wide Policy and Pattern

235. The exclusive dealing requirements, supplier restrictions, and termination threats imposed on Plaintiff were not isolated. They constitute an enterprise-wide policy applied

uniformly to dealers operating under Defendant Shoffner's system, particularly those in their first year of operation. Plaintiff has identified multiple former dealers prepared to testify under oath that they experienced the same pattern of misrepresentations regarding independence and earning potential, mandatory exclusive dealing with Shoffner-designated suppliers, threats of termination for attempting to source alternatives, discovery that they owned and controlled no meaningful aspect of their businesses, and threats of litigation upon questioning the system or attempting to exit. The consistency of experience across multiple dealers and years establishes a systematic pattern and practice of anticompetitive restraint implemented at the enterprise level.

### F. Exclusive Dealing with Defendant CVB Inc. / Malouf

236. The conspiracy extended beyond mattresses to accessories, mandating exclusive purchases from Defendant CVB Inc. d/b/a Malouf. This exclusivity was imposed through opening orders and enforced operationally, as reflected in Defendant Shoffner's opening order communications and attached spreadsheets directing purchases exclusively to Malouf **(Ex. B, C)**.

237. Throughout Plaintiff's tenure, CVB Inc. was chronically unable to fulfill orders for essential products, including bed frames ("high-rises") and mattress protectors. Plaintiff received repeated "out of stock" notifications and experienced extended delays that materially impaired his ability to operate and make sales. Despite these failures, Defendant Shoffner refused all requests to allow sourcing from alternative suppliers, even for temporary or display-only purposes, enforcing exclusivity through threats of termination.

238. During investigation of this action, Plaintiff discovered through Texas Comptroller public records that CVB Inc.'s certificate of authority to transact business in Texas was forfeited from June 24, 2022, through October 24, 2023. Under Texas law, an entity in forfeited status lacks authority to transact business or enforce contracts in the state. While Plaintiff's dealership commenced after this forfeiture period, the correlation between CVB Inc.'s loss of good standing and its chronic inability to supply dealers operating under Defendant Shoffner's control, combined with Shoffner's refusal to permit

alternative sourcing, raises serious questions regarding the legality and operational integrity of the exclusive supplier arrangement.

239. Defendant Shoffner, as the controlling person who mandated exclusive dealing with CVB Inc., had a duty to ensure that his designated supplier was legally authorized and capable of performance. Whether through willful ignorance or deliberate disregard, the result was the same: dealers were bound to a chronically failing supplier while prohibited from competitive sourcing, shifting all inventory risk onto dealers and insulating CVB Inc. from market discipline.

240. This arrangement, which tied dealers to a single, chronically underperforming and at-times legally forfeited supplier while prohibiting alternatives, constituted an unreasonable restraint of trade with no pro-competitive justification and served only to protect Defendant Shoffner and CVB Inc. from competition.

## G. Captive Financing and Retaliatory Enforcement via Defendant West Creek Financial (Koalafi)

241. Defendant West Creek Financial, Inc., d/b/a Koalafi, was operationally integrated into Defendant Shoffner's control apparatus. Its representative, identified as "Jay," was a regular participant in dealer coaching calls conducted under Defendant Shoffner's direction, where financing strategies were coordinated with prescribed sales tactics.

242. Upon Plaintiff's exit from Defendant Shoffner's system, Koalafi—through Jay—abruptly closed Plaintiff's merchant financing account without notice or justification. The account was held in Plaintiff's own name and Tax EIN and was shut down mid-transaction during active litigation. This action was punitive rather than procedural.

243. The retaliatory nature of Koalafi's conduct is underscored by the stark contrast with another financing provider promoted within Defendant Shoffner's system, Snap Finance, which promptly and professionally processed the same administrative request without issue. When Plaintiff demanded an explanation from Koalafi, Jay mirrored Defendant Shoffner's own stonewalling tactics, repeatedly promising managerial review while ensuring that no manager ever contacted Plaintiff.

244. By integrating its services into Defendant Shoffner's controlled network and then executing unexplained punitive action against a departing dealer, Defendant West Creek Financial functioned as a practical enforcement arm of the conspiracy, using access to essential consumer financing as a tool of retaliation to punish exit and deter resistance.

**H. Predatory Litigation as Enforcement Mechanism of the Conspiracy**

245. The exclusive dealing conspiracy alleged herein is enforced not only through threats of termination and retaliatory financing cutoffs, but also through systematic predatory litigation designed to financially destroy dealers who resist and to deter others from challenging the restraints of trade.

246. Plaintiff has documented, through publicly available court records, 62 civil cases involving Defendant Shoffner's enterprise from 2014–2024, of which 61 were initiated by Shoffner against dealers—a 61:1 plaintiff ratio demonstrating that litigation is a systematic enforcement tool of the conspiracy rather than occasional dispute resolution **(Ex. K)**. The predatory nature of this strategy is exemplified by a $341,462.25 arbitration award obtained against former MBA dealer John Williams, consisting of just $80,000 in actual damages but $232,595.50 in claimed attorney fees—a 2.91:1 fee-to-damages ratio that is economically irrational unless the purpose is deterrence rather than recovery. In that same proceeding, the arbitrator ruled that the 2019 Washington State Consent Order—signed by Defendant Shoffner and directly evidencing the business-opportunity fraud alleged herein—was "irrelevant" and excluded it from consideration. That same arbitrator, William F. Adams, was assigned to Plaintiff's case approximately five weeks later, represented by the same counsel who had requested his appointment despite knowing the Williams award was under active federal challenge for arbitrator bias (Case No. 3:25-cv-00747, M.D. Fla.). Adams's initial disclosure to Plaintiff disclosed no prior involvement with MBA. Only after Plaintiff's objection did Adams issue a supplemental disclosure, which still omitted the award amount, its recency, and the pending federal challenge. The full record of these procedural violations and concealment is documented in Plaintiff's formal challenge to the arbitrator and AAA administration **(Ex. L, II)**. This pattern of using arbitration as a coercive weapon is further evidenced by the systematic, six-stage escalation tactics documented in **Exhibit X**. Defendants deployed this campaign

against Plaintiff immediately following the Williams award, even securing the appointment of the same arbitrator—a fact both Arbitrator Adams and Shoffner's attorney failed to properly disclose **(Ex. L, II)**.

247. The systematic use of predatory litigation and structurally compromised arbitration to enforce exclusive dealing and suppress dealer resistance constitutes an independent restraint of trade. Courts have recognized that litigation may lose its immunity from antitrust scrutiny when it is used as an anticompetitive weapon rather than legitimate dispute resolution. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60–61 (1993). The combination of exclusive dealing mandates, threats of termination, captive financing arrangements, and predatory litigation create a comprehensive system of restraint that forecloses competition, suppresses dealer resistance, and maintains Defendants' anticompetitive control over the dealer network.

## XIV. CRITICAL DISTINCTION: INDEPENDENT TORTS, NOT CONTRACT DISPUTES

248. The wrongs alleged in this Complaint are not breaches of contract. They are personal tortious conduct by Defendant Charles Edwin Shoffner and conspiratorial acts by all Defendants.

249. These claims exist independently of any contract and would exist even if Plaintiff had never signed any agreement with Defendant Shoffner. Defendant Shoffner's misrepresentations and concealments, including the knowing acquisition of a business built on stolen trade secrets, materially false sworn statements in federal litigation, and regulatory admissions of unlawful conduct, constitute common law fraud regardless of any contractual relationship. The agreement among Shoffner, Sherwood Southwest, CVB Inc. d/b/a Malouf, and West Creek Financial to restrain trade through exclusive dealing, supplier control, and captive financing constitutes civil conspiracy, an independent tort. The Sherman Act and Texas Antitrust Act prohibit restraints of trade irrespective of whether such restraints are memorialized in a private agreement, particularly where the agreement itself is procured through fraud. Defendants' interference with Plaintiff's business relationships and financing constitutes tortious interference, actionable without

59

reference to contract interpretation, as demonstrated by their documented campaign of coercive legal escalation **(Exhibit X)**.

250.    These are not contract disputes. They are independent legal wrongs for which Defendants are personally and jointly liable.

## XV. PLAINTIFF'S POSITION ON ARBITRATION

251.    Defendant Shoffner has initiated arbitration proceedings against Plaintiff with the American Arbitration Association. Plaintiff does not consent to arbitrate the claims asserted in this federal action.

252.    This lawsuit is separate and distinct from any arbitration involving Defendant Shoffner's LLC. The arbitration concerns a corporate entity not named as a Defendant here and purports to involve contract-based claims. This action concerns Defendant Shoffner's personal fraud and conspiracy, the participation of non-signatory Defendants Sherwood Southwest, CVB Inc./Malouf, and West Creek Financial in restraints of trade, federal and state antitrust violations implicating non-arbitrable public rights, and independent torts that exist regardless of any contract.

253.    Plaintiff appeared in preliminary arbitration proceedings solely to challenge jurisdiction and to preserve objections, expressly reserving all rights and objecting pursuant to AAA Commercial Rule R-7 **(Ex. GG)**. As reflected in the arbitrator's orders, Plaintiff withdrew and will not participate further.

254.    Following Plaintiff's jurisdictional objections, the arbitrator—at the request of MBA— imposed a sweeping Confidentiality Order that would prohibit disclosure of evidence of the fraudulent and anticompetitive conduct alleged in this action. The timing and scope of that order demonstrate that the arbitration is being used as a mechanism to suppress evidence of ongoing unlawful conduct, including conduct affecting the public and market competition.

255.    Plaintiff will not participate in any arbitration proceeding that requires compliance with a confidentiality regime designed to conceal evidence central to this federal antitrust and

fraud action. Plaintiff reserves all rights to challenge any arbitral award through vacatur proceedings based on fraud, unconscionability, lack of consent, and violation of public policy.

256. This Court retains jurisdiction to adjudicate these claims. They involve different parties, different causes of action, different relief, and non-waivable public rights under federal and Texas antitrust law. Any parallel arbitration concerning a contract alleged to be void due to fraud and illegality cannot displace this Court's duty to adjudicate independent torts and restraints of trade.

257. Plaintiff does not seek judicial review of arbitral rulings, nor does Plaintiff ask this Court to adjudicate compliance with arbitration rules or ethics standards. Plaintiff alleges the facts concerning the assignment and disclosures of Arbitrator Adams solely to demonstrate that Defendants' repeated invocation of arbitration and delegation clauses functions as a mechanism to prevent judicial review of threshold issues of fraud, contract formation, and enterprise-wide misconduct. Plaintiff's objection is jurisdictional and structural, not procedural, and is preserved for appellate review and, if necessary, future vacatur proceedings **(Ex. L, II)**.

## CONCLUSION

258. Antitrust claims are necessarily fact-intensive and ordinarily require extensive discovery and economic proof. This case already meets that threshold. Plaintiff appears before this Court having assembled an evidentiary record exceeding 300 exhibits that documents the operational structure, historical evolution, and coordinated conduct underlying the anticompetitive scheme alleged herein.

259. Plaintiff appears before this Court with evidence, not speculation. The record reflects a system that has repeatedly displaced competition, foreclosed alternative suppliers and financing sources, and extracted capital through structural coercion rather than market merit. The injuries alleged are not confined to Plaintiff; they are the predictable result of a model that depends on high attrition, suppressed competition, and fragmented adjudication to persist.

61

260.    Courts are rarely presented with the opportunity to view such a system in its entirety. Fragmentation across forums—including arbitration proceedings, isolated civil actions, and regulatory settlements—has historically prevented unified review. This case consolidates those fragments into a single, coherent evidentiary narrative capable of judicial evaluation under federal and state antitrust and consumer-protection law.

261.    Plaintiff is prepared to present documentary proof of the system's design, enforcement mechanisms, and economic effects. The evidence includes prior judicial findings of trade secret theft and alter ego control **(Ex. G, R)**, regulatory admissions of business opportunity fraud **(Ex. D)**, sworn testimony revealing coordinated deception **(Ex. V, J)**, financial records demonstrating supracompetitive pricing **(Ex. B, C)**, and internal communications that collectively establish knowing, repeated, and systematic conduct inconsistent with lawful competition.

262.    However, Plaintiff recognizes that the full scope of the conspiracy alleged herein—particularly its enterprise-wide nature and systematic enforcement across multiple dealers—cannot be proven through Plaintiff's direct experience alone. Pattern evidence from other victims is essential to demonstrating that the conduct alleged is not isolated but reflects a coordinated, repeatable scheme affecting interstate commerce.

263.    Accordingly, Plaintiff intends to seek discovery from the following sources to establish the systematic nature of Defendants' anticompetitive conduct:

**A. Testimony from Participants in the Alleged Conspiracy:**

264.    The discovery requested below is narrowly tailored and proportional to the needs of this case to: (1) trace the continuity of the fraudulent business model from its inception in 2009; (2) establish the pattern of using interchangeable shell entities to evade liability, obscure ownership, and thwart jurisdiction; (3) prove the alter ego relationship between Shoffner and the operating entities; (4) quantify the unjust enrichment of the conspirators; and (5) expose the financial incentives driving the predatory system. This need is demonstrated by Shoffner's documented federal perjury regarding entity control **(Ex. F, I)**, and by official records showing a network of similarly-named LLCs formed and dissolved under his control (e.g., "Mattress By Appointment, LLC" (SC, 2014),

"Mattress By Appointment of Greenville LLC" (SC, 2015), "JB's Mattresses LLC" renamed to "Mattress By Appointment LLC" (SC, 2014), and the Florida "Carolina Bedding Direct, LLC" renamed to "Mattress By Appointment, LLC" (2014) under his management) **(Ex. S, T)**.

265.    **1. Defendant Charles Edwin Shoffner** – Regarding his personal knowledge of the 2009 trade secret theft, the 2019 Washington Consent Order, the design and implementation of the exclusive dealing system, private label arrangements with Sherwood Southwest, markup structures, coordination with co-conspirators, and the predatory litigation strategy. Further, regarding his personal financial gains from the enterprise, including:

a.    His personal financial situation, assets, and net worth for the seven (7) years prior to Plaintiff's engagement through the present, to establish the magnitude of his enrichment from the alleged scheme and his ability to satisfy a judgment;

b.    The identity of all individuals or entities who have received bonuses, commissions, referral fees, kickbacks, or other contingent compensation from him or his entities related to the recruitment of dealers, the sale of products to dealers, the placement of dealer financing, or the initiation or prosecution of litigation or arbitration against dealers (including, but not limited to, payments to attorneys, recruiters, coaches, and supplier representatives);

c.    The individual(s) within his enterprise responsible for managing dealer status, including tracking dealer forfeitures, defaults, and involvement in litigation or arbitration. This designee shall be required to produce a complete list of all individuals or entities who have operated as "dealers," "owners," or "members" under the Mattress By Appointment system or its predecessor models from 2019 to the present, including their current status (e.g., active, terminated, in litigation, in default, in arbitration) and shall be prepared to testify regarding the criteria, processes, and volume related to such status changes.

266.    **2. Katie Hein (MBA Head of Dealer Coaching)** – Regarding her admission that the "50–80% off" pricing was a fraudulent "hook," the targeting of financially vulnerable

dealers with limited capital, standardized bait-and-switch training, and enterprise-wide enforcement of exclusive dealing restrictions **(Ex. E)**.

267. **3. Tim Heatley (MBA Recruiter)** – Regarding the standardized recruitment process, the 35-day communication sequence designed to extract financial commitments before contract disclosure, the physical concealment of the Dealer Agreement within the binder, and whether this process was applied uniformly to all MBA dealers **(Ex. Y, Z)**.

268. **4. "Coach Joe" and "Coach David" (MBA Dealer Coaches)** – Regarding enforcement of exclusive dealing restrictions, threats of termination for alternative sourcing, instructions to use "bait" products, knowledge of Malouf supply failures, and whether these restrictions were imposed on all dealers uniformly **(Ex. A, E, M)**.

269. **5. Keith Mackey (MBA Chief Sales Officer)** – Regarding his refusal to provide written clarification of supplier restrictions, knowledge of the exclusive dealing policy, and the deliberate strategy of avoiding creation of discoverable records **(Ex. A)**.

270. **6. David Shiroff (MBA General Counsel)** – Regarding the timing of Dealer Agreement distribution, the binder concealment mechanism, the $60,000 demand following Plaintiff's termination, and coordination with AAA regarding arbitration proceedings **(Ex. AA, FF)**.

**B. Testimony from Co-Conspirator Entities:**

271. **7. Sherwood Southwest LLC (Person Most Knowledgeable)** – Regarding exclusive supply agreements with MBA, volume commitments, pricing structures, markup arrangements, private label manufacturing, and knowledge of dealer restrictions.

272. **8. CVB Inc. d/b/a Malouf (Person Most Knowledgeable and Dale Burnett)** – Regarding exclusive supply agreements with MBA, chronic supply failures to dealers, knowledge that dealers were prohibited from alternative sourcing, and financial benefits from the captive dealer arrangement.

273. **9. West Creek Financial, Inc. d/b/a Koalafi ("Jay" and Person Most Knowledgeable)** – Regarding revenue-sharing agreements with MBA, participation in dealer coaching

calls, the retaliatory closure of Plaintiff's merchant account, and coordination with MBA to enforce dealer compliance.

**C. Pattern Testimony from Current and Former MBA Dealers:**

274.    **10. Three Former MBA Dealers (Including Military Veteran)** – Who experienced identical exclusive dealing restrictions, supply failures, bait-and-switch requirements, financial losses, and contract concealment, demonstrating the enterprise-wide nature of the alleged conspiracy.

275.    **11. Ten Additional Current and Former MBA Dealers** – To be identified through discovery, who can testify regarding:

- Whether they were required to purchase exclusively from Sherwood Southwest and CVB Inc./Malouf

- Whether they were threatened with termination for attempting alternative sourcing

- Whether they experienced supply failures from Malouf while being prohibited from sourcing alternatives

- Whether they were trained to use bait-and-switch sales tactics

- Whether the Dealer Agreement was concealed in the same manner during their onboarding

- Whether they suffered financial losses as a result of the restrictions imposed

**D. Financial and Contractual Documentation:**

276.    **Complete agreements between Sherwood Southwest and MBA/Shoffner** – Including exclusive dealing provisions, volume guarantees, pricing structures, markup arrangements, and private label manufacturing terms.

277.    **Complete agreements between CVB Inc./Malouf and MBA/Shoffner** – Including exclusive dealing provisions, revenue arrangements, and correspondence regarding dealer supply failures.

278. **Complete agreements between Koalafi and MBA/Shoffner** – Including revenue-sharing provisions, referral fee structures, integration into MBA's coaching system, and policies regarding account closures for non-MBA dealers.

279. **Bank records from Defendant Shoffner** – Showing payments to and from Sherwood Southwest, CVB Inc./Malouf, and Koalafi, demonstrating financial flows within the conspiracy; payments to attorneys in MBA litigation matters; and comparison of legal fees paid versus arbitration awards received, demonstrating the predatory nature of litigation strategy.

280. **Pricing documentation** – Showing Sherwood's wholesale prices to MBA versus MBA's prices to dealers, demonstrating supracompetitive markups enabled by exclusive dealing; and fake MSRP/suggested retail price lists used to create fraudulent discount claims **(Ex. E)**.

281. **Records from the American Arbitration Association:**

282. **Case records for ten MBA dealer arbitrations** – To establish pattern evidence of:

   - Predatory fee awards (comparing actual damages to attorney fee claims)
   - Systematic use of confidentiality orders to suppress dealer testimony
   - Whether the same arbitrators are repeatedly assigned to MBA cases
   - Whether fee-to-damages ratios in MBA cases exceed AAA system-wide averages

283. **Assignment records for Arbitrator Bill Adams** – Including disclosure statements, prior MBA case assignments, and internal AAA communications regarding the assignment of Adams to Plaintiff's case approximately two months after Adams awarded MBA $341,462.25 in the Williams arbitration **(Ex. L, II)**.

284. **AAA case management records** – Identifying personnel who handled MBA cases, whether AAA tracks repeat-player status for high-volume claimants like MBA, and financial arrangements between AAA and MBA.

285. This discovery is not speculative. Plaintiff has already identified specific individuals, entities, and documents that possess direct evidence of the alleged conspiracy. The

pattern allegations set forth in this Complaint are based on Plaintiff's personal experience, publicly available litigation records, regulatory findings, and sworn testimony from participants in the scheme. Discovery will either confirm these patterns across the dealer network or disprove them. Either outcome serves the interest of justice.

286.   Plaintiff does not ask this Court to accept conclusions. Plaintiff asks this Court to permit the presentation of evidence—evidence that is specific, documented, and obtainable through standard discovery procedures. The conspiracy alleged herein is provable because it operated systematically, left documentary trails, and affected multiple victims who can testify under oath.

287.   This action is not brought solely for retrospective relief. It implicates ongoing market harm and the continued exclusion of participants who lack the resources to withstand prolonged financial extraction or fragmented legal processes. Antitrust laws exist precisely to address such conditions—where individual enforcement is impracticable, but systemic injury is clear.

288.   The factual allegations set forth in this Complaint rest upon a foundation of documented evidence assembled through diligent investigation over an extended period. This evidentiary foundation includes official court records, regulatory findings memorialized in consent orders, sworn testimony from participants in the alleged conduct, **including Defendant Shoffner's own contradicted sworn statements (Exhibit F)**, contemporaneous business communications, and financial records spanning multiple years and jurisdictions. Where allegations concern matters within the exclusive knowledge or control of Defendants or third parties, Plaintiff has identified the specific sources from which such evidence may be obtained through ordinary discovery processes recognized and provided for under the Federal Rules of Civil Procedure. Plaintiff respectfully submits that each material allegation herein is susceptible to proof through admissible evidence, and Plaintiff stands prepared to authenticate and present such evidence as the proceedings require.

Plaintiff respectfully submits that this Court is uniquely positioned to evaluate the full scope of the conduct alleged and to determine whether the continuation of such practices

67

is consistent with federal and state law, judicial economy, and the public interest. The evidence is assembled. The conspiracy is documented. Plaintiff seeks the opportunity to prove it through the testimony and records identified above.

## CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF SHERMAN ACT § 1

*(Against Defendants Charles Edwin Shoffner, Sherwood Southwest LLC, CVB Inc., and West Creek Financial, Inc.)*

289. Plaintiff realleges and incorporates by reference all preceding factual allegations. Because the Dealer Agreement is void ab initio due to Defendants' fraud, failure to comply with mandatory federal and state disclosure requirements, and violations of the FTC Franchise Rule and Texas Business Opportunity Act, no valid express contract governs the subject matter, and Plaintiff's equitable claim for unjust enrichment is not precluded.

290. Defendants entered into and participated in a continuing contract, combination, or conspiracy in unreasonable restraint of trade and commerce among the several States, in violation of Section 1 of the Sherman Act. The conspiracy included exclusive dealing arrangements, coordinated refusals to deal, group boycotts, and retaliatory enforcement mechanisms that foreclosed competition in the markets for supplying mattresses, accessories, and financing to dealers operating under Defendant Shoffner's control, and distorted competition in the downstream retail mattress market.

291. The challenged conduct constitutes a per se violation of antitrust law and, alternatively, an unreasonable restraint of trade under the rule of reason with no legitimate pro-competitive justification. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered antitrust injury to his business and property.

### COUNT II – VIOLATION OF SHERMAN ACT § 2

*(Against Defendants Charles Edwin Shoffner, Sherwood Southwest LLC, CVB Inc., and West Creek Financial, Inc.)*

292.    Plaintiff realleges and incorporates by reference all preceding factual allegations.

293.    Defendants, acting in concert, attempted to monopolize and conspired to monopolize trade and commerce in relevant markets, including the market for supplying products and services to dealers operating under Defendant Shoffner's control. Defendants possessed monopoly power or, at minimum, a dangerous probability of achieving monopoly power, and engaged in exclusionary and predatory conduct with specific intent to monopolize, including exclusive dealing, coordinated retaliation, and suppression of alternative supply and financing sources.

294.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered antitrust injury.

## COUNT III – VIOLATION OF TEXAS FREE ENTERPRISE AND ANTITRUST ACT

*(Against Defendants Charles Edwin Shoffner, Sherwood Southwest LLC, CVB Inc., and West Creek Financial, Inc.)*

295.    [Intentionally left blank for numbering continuity.]

296.    Plaintiff realleges and incorporates by reference all preceding factual allegations.

297.    Defendants' conduct constitutes a contract, combination, or conspiracy in restraint of trade or commerce in violation of the Texas Free Enterprise and Antitrust Act. The conduct constitutes a per se violation and, alternatively, an unreasonable restraint of trade under the rule of reason with no legitimate business justification. Plaintiff suffered injury to his business and property as a direct and proximate result.

## COUNT IV – COMMON LAW FRAUD

*(Against Defendant Charles Edwin Shoffner Individually)*

298.    Plaintiff realleges and incorporates by reference all preceding factual allegations.

299.    Defendant Shoffner is sued individually for his personal fraudulent conduct. Shoffner made material misrepresentations and concealed material facts, including the true nature

69

of the business system he controlled, his prior misconduct and regulatory actions, and the restrictive and coercive policies imposed on dealers, knowing such representations were false or made with reckless disregard for their truth.

300. Shoffner intended to induce Plaintiff's reliance. Plaintiff justifiably relied on the misrepresentations and omissions and suffered substantial damages as a result, including the loss of over $150,000 in invested capital.

## COUNT V – FRAUD BY NONDISCLOSURE

*(Against Defendants Charles Edwin Shoffner, Sherwood Southwest LLC, CVB Inc., and West Creek Financial, Inc.)*

301. Plaintiff realleges and incorporates by reference all preceding factual allegations.

302. Defendants had a duty to disclose material facts necessary to make their representations not misleading, including the true nature of the business model, known supply failures, restrictive policies, and coordinated enforcement mechanisms used against dealers. Defendants intentionally failed to disclose these facts to induce Plaintiff into the transaction.

303. Plaintiff justifiably relied on Defendants' nondisclosures and suffered damages as a direct and proximate result.

## COUNT VI – CIVIL CONSPIRACY

*(Against Defendants Charles Edwin Shoffner, Sherwood Southwest LLC, CVB Inc., and West Creek Financial, Inc.)*

304. Plaintiff realleges and incorporates by reference all preceding factual allegations.

305. Defendants knowingly agreed and combined to accomplish unlawful objectives, including restraining trade and defrauding Plaintiff, and committed overt acts in furtherance of the conspiracy. Defendants acted with malice and specific intent to cause injury. Plaintiff suffered damages as a direct result.

## COUNT VII – VIOLATIONS OF TEXAS DECEPTIVE TRADE PRACTICES– CONSUMER PROTECTION ACT

*(Against Defendants Charles Edwin Shoffner, Sherwood Southwest LLC, CVB Inc., and West Creek Financial, Inc.)*

306.   Plaintiff realleges and incorporates by reference all preceding factual allegations.

307.   Plaintiff was a consumer under the DTPA. Defendants engaged in false, misleading, and deceptive acts and practices, failed to disclose material information, and engaged in unconscionable conduct in connection with the transaction at issue. Defendants' violations were committed knowingly and intentionally.

308.   Plaintiff suffered economic damages as a direct and proximate result and is entitled to treble damages and other relief permitted by law.

## COUNT VIII – TORTIOUS INTERFERENCE BY UNLAWFUL MEANS (Enterprise Conduct)

*(Against Defendants Charles Edwin Shoffner, Sherwood Southwest LLC, CVB Inc., and West Creek Financial, Inc.)*

309.   Defendants knowingly and intentionally interfered with Plaintiff's existing and prospective business relationships through a coordinated course of conduct that made lawful operation impossible while Defendants retained the benefits of Plaintiff's investment.

310.   Defendant CVB Inc. knew throughout Plaintiff's tenure that required inventory and accessories were unavailable, yet instructed Plaintiff to remain within the system rather than disclose the supply failure. This foreseeably caused customers to walk away and interfered with Plaintiff's prospective sales.

311.   Defendant Sherwood Southwest LLC is a sophisticated national manufacturer and distributor with enterprise-level compliance, reporting, and dealer-oversight capabilities. Sherwood either knew, or in the exercise of reasonable commercial diligence should have known, that dealers operating under Defendant Shoffner's system were being induced to

71

invest capital while lacking access to adequate inventory, accessories, and financing necessary to operate.

If Sherwood possessed actual knowledge of these conditions, its continued participation and profit constituted knowing facilitation of the unlawful enterprise. If Sherwood lacked such knowledge, that failure resulted from a willful or negligent refusal to investigate circumstances that would have been apparent to any reasonable distributor of its size and sophistication.

In either case, Sherwood unjustly benefited from Plaintiff's participation while Plaintiff's business relationships were foreseeably destroyed, rendering Sherwood jointly liable for the resulting harm.

312.  Defendant West Creek Financial, Inc. abruptly terminated Plaintiff's financing access without notice, explanation, or returned communication, effectively shutting down Plaintiff's ability to transact with customers in real time and damaging Plaintiff's reputation and customer relationships.

313.  Defendant Shoffner and his enterprise refused repeated requests for access to adequate inventory and accessories, while simultaneously imposing unattainable sales thresholds as a precondition for relief. Defendants were aware that customers were leaving as a result, yet persisted in these restrictions.

314.  This conduct was not competitive, justified, or accidental. It was carried out through deception, concealment, and coercive leverage, and constituted tortious interference by independently unlawful means. Defendants knew or should have known that their actions would destroy Plaintiff's business relationships and future expectancy.

315.  As a direct and proximate result, Plaintiff suffered substantial economic loss, reputational harm, and long-term impairment of business opportunity.

316.  Plaintiff realleges and incorporates by reference all preceding factual allegations.

317.  Plaintiff had a reasonable probability of entering into beneficial business relationships with alternative suppliers, financing providers, and customers. Defendants intentionally

and without justification interfered with those relationships through exclusive dealing, refusals to permit alternative sourcing, and retaliatory conduct. Plaintiff suffered damages as a result.

## COUNT IX – UNJUST ENRICHMENT

*(Against Defendants Charles Edwin Shoffner, Sherwood Southwest LLC, CVB Inc., and West Creek Financial, Inc.)*

318.   Plaintiff realleges and incorporates by reference all preceding factual allegations.

319.   Defendants' enterprise was structurally designed for high-volume capital extraction, not sustainable partnership. This is demonstrated by its documented history: between January 2012 and September 2014 alone, 190 of 289 dealers departed—a turnover rate exceeding 65%—demonstrating a "churn and burn" model where dealers were systematically cycled through **(Ex. J)**.

320.   The model's profitability depended on a fraudulent "bait-and-switch" sales practice. As documented in **Exhibit E**, a corporate sales trainer identified as "Coach David," assigned to Plaintiff during onboarding and acting within the scope of that role, instructed Plaintiff via text message that the advertised "$150 mattress" was "for display only, not sale." Coach David explicitly described the strategy as "the bait" to use a low advertised price to lure customers, with the "payment plan" serving as further "bait" to "catch people" and drive higher spending **(Ex. E)**.

321.   Plaintiff's contemporaneous, pre-litigation reaction to this scheme, documented in the same Exhibit E, proves he was ethically incompatible with the fraud, not a failed salesman. After his first sales (approximately $1,600), Plaintiff expressed distress, stating: "I understand, but my life experience is to be genuine and not misleading to anyone… People sense sincerity in my voice and it builds trust." Plaintiff further stated he was "genuinely embarrassed" in front of customers by what he was being asked to present as bait—the $150 mattress marketing ploy (Ex. E). **Plaintiff was forced to spend his own money to get people into his store, not to sell a quality mattress, but to upsell them to Koalifi's financing and finance a mattress most could not afford.**

Plaintiff's investment bought him a job in a deception he could not execute, not a legitimate business of his own as advertised and promised.

322. When Plaintiff, acting in good faith, sought written clarification of these restrictive and deceptive policies to operate lawfully, Defendants' leadership refused. Their in-house counsel directed their Chief Sales Officer to state that engaging "would not serve the interests of the enterprise" **(Ex. A)**. This was a tactical refusal to create a discoverable record, mirroring a pattern previously identified by a court. As established in **Exhibit P**, a South Carolina court, faced with Defendants' unreliable representations, acted sua sponte to order that all future pleadings be verified by the highest-ranking corporate officer.

323. At that precise moment—after Defendants had already extracted Plaintiff's capital, and Plaintiff had demonstrated both an understanding of the fraud and a conscience that rejected it—the basis for Defendants' retention of the benefits shifted from a purported partnership to an inequitable windfall. Plaintiff had become a legal and reputational liability to be managed, consistent with Defendants' documented churn-based model. Equity does not permit a party to profit by inducing investment through fraud and then discarding the investor when he refuses to participate in the illegality.

324. Defendants' retention of all fees, markups, and revenue obtained from Plaintiff under these circumstances—secured by fraud and retained after they severed the relationship to avoid ethical and legal scrutiny—is unjust.

325. Plaintiff is therefore entitled to restitution and disgorgement of all benefits Defendants unjustly retained.

## COUNT X – THEFT BY DECEPTION

### Texas Civil Practice & Remedies Code § 134.001 et seq.

*(Against Defendants Charles Edwin Shoffner, Sherwood Southwest LLC, CVB Inc., and West Creek Financial, Inc.)*

326. Plaintiff realleges and incorporates by reference all preceding factual allegations.

327. Defendants unlawfully appropriated Plaintiff's property, including more than $150,000 in capital investment, lease payments, mandatory inventory purchases, and marketing expenditures, by deception, in violation of Texas Penal Code § 31.03 and the Texas Theft Liability Act.

328. Defendants obtained Plaintiff's property by creating and confirming false impressions regarding Plaintiff's ability to operate an independent dealership, failing to correct those false impressions, preventing Plaintiff from acquiring material information through concealment and refusal to clarify restrictions, and promising performance and support they did not intend to provide.

329. Defendants acted with intent to deprive Plaintiff of his property. As a direct and proximate result, Plaintiff suffered economic damages exceeding $150,000 and is entitled to treble damages, court costs, and reasonable attorney's fees pursuant to Texas Civil Practice & Remedies Code § 134.005.

## COUNT XI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*(Against All Defendants)*

330. [Intentionally left blank for numbering continuity.]

331. Defendants engaged in a course of conduct intended to psychologically exhaust, intimidate, and silence Plaintiff rather than resolve any dispute in good faith. Defendants knowingly exploited Plaintiff's financial dependence and escalated litigation pressure during periods of extreme personal vulnerability.

332. Defendants acted with actual knowledge that Plaintiff was the primary caregiver to a young child and was experiencing the terminal illness and death of his mother, followed by the serious and progressive decline of his father. Despite this knowledge, Defendants refused reasonable accommodation and instead intensified coercive legal conduct.

333. Defendants' actions foreseeably deprived Plaintiff of irreplaceable time and emotional presence with his child and parents, caused prolonged cognitive impairment during grief,

and forced Plaintiff into sustained psychological distress that cannot be remedied through economic recovery alone.

334.   Defendants' conduct has further caused direct and ongoing harm to Plaintiff's family relationships. Plaintiff's brother, Anthony De Los Santos, is a W-2 employee with no ownership interest in Procreate LLC. Defendants used Anthony's electronic signature—obtained through the same concealed DocuSign process without knowledge of the underlying contractual terms—to add him as a named Respondent in arbitration proceedings seeking $299,000. As a direct and foreseeable result of Defendants' conduct, Anthony now reserves the right to pursue legal action against Plaintiff for the financial and legal consequences of his inclusion in the arbitration. This has caused ongoing family strife between Plaintiff and his brother—a relationship that Plaintiff, as a single father with limited family support, depends upon. Defendants converted a W-2 employee's routine signature into a weapon that now threatens to fracture the only immediate family support system available to Plaintiff and his four-year-old daughter.

335.   The emotional injuries inflicted upon Plaintiff are independent of Defendants' economic misconduct and constitute severe emotional distress under Texas law. Defendants intended to cause such distress or acted with reckless disregard for the certainty that it would occur.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff JAMES DE LOS SANTOS seeks relief for the independent torts and statutory violations arising from Defendants' fraudulent scheme and coercive campaign, as documented in **Exhibit X** and the incorporated evidence:

1.   For compensatory damages in an amount to be proven at trial, including but not limited to Plaintiff's sunk capital investment, destruction of business value and digital assets, lost profits, antitrust overcharges, and other compensable harms proximately caused by Defendants' conduct, including emotional distress;

2.   For treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, for antitrust injuries proven under Counts I and II;

3. For treble damages pursuant to Section 15.21 of the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Com. Code § 15.21, for antitrust injuries proven under Count III;

4. For treble damages for knowing violations of the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.50(b)(1), proven under Count VII;

5. For treble damages and attorney's fees pursuant to the Texas Theft Liability Act, Tex. Civ. Prac. & Rem. Code § 134.005, proven under Count X;

6. For punitive and exemplary damages based on Defendants' willful, knowing, and malicious conduct, including the substantial loss of time, resources, and emotional capacity inflicted upon Plaintiff during a period of extraordinary family hardship;

7. For a declaratory judgment that any non-compete, non-disclosure, or confidentiality clause in any agreement between Plaintiff and any Defendant is void, unenforceable, and invalid as a product of fraud, illegality, and anticompetitive conduct;

8. For costs and reasonable attorney's fees as provided by the Clayton Act, the Texas Free Enterprise and Antitrust Act, the Texas Deceptive Trade Practices Act, the Texas Theft Liability Act, and other applicable law;

9. For pre-judgment and post-judgment interest at the highest lawful rate;

10. Plaintiff seeks only those remedies within this Court's authority and does not request adjudication of arbitral procedures or oversight of any arbitral forum; and

11. For such other and further relief as this Court deems just and proper.

---

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

---

**VERIFICATION**

I, James De Los Santos, declare under penalty of perjury under the laws of the United States that:

I am the Plaintiff in this action.

I have read the foregoing First Amended Verified Complaint.

The facts alleged in this First Amended Verified Complaint regarding my personal experiences, communications, and interactions with Defendants are true and correct based on my personal knowledge.

The facts alleged regarding the 2009 Ohio trade secret judgment, Darren Conrad's 2015 affidavit, and Shoffner's sworn statements and regulatory acknowledgments on official court records and sworn statements, copies of which are attached as exhibits.

The facts alleged regarding CVB Inc.'s forfeiture in Texas are based on official Texas Secretary of State records and Texas Comptroller documents.

The facts alleged regarding Shoffner's sworn misrepresentations are based on official federal court records and state corporate filings, copies of which are attached as exhibits.

The facts alleged regarding the conduct of other dealers operating under Defendant Shoffner's system and the enterprise-wide nature of Defendants' exclusive dealing and enforcement practices are stated on information and belief based on my communications with other dealers and my understanding of the business practices imposed by Defendant Shoffner, and I believe them to be true.

I am prepared to testify under oath at trial to all facts alleged herein based on my personal knowledge.

I understand that this Verification subjects me to penalties for perjury under federal and state law if any statement herein is false.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of February, 2026, at Austin, Texas.

Respectfully submitted,

**/s/ James De Los Santos**

**JAMES DE LOS SANTOS**

Plaintiff, Pro Se

7801 N. Lamar Blvd., Ste. C71

Austin, TX 78752

(737) 775-6880

jmtexas3@gmail.com


**APPENDIX A — EVIDENTIARY INDEX AND SUMMARY**

**Notice to the Court**

**The following summaries are provided solely to assist the Court in navigating the accompanying exhibits. Each summary is descriptive in nature and identifies the subject matter and general relevance of the exhibit without argument. The exhibits themselves are incorporated by reference and speak for their full contents. Nothing in this summary is intended to supplement, modify, or substitute for the exhibits themselves.**


**Evidentiary Summary of Exhibits**

**Exhibit A — Plaintiff's Good-Faith Attempt to Resolve & Defendants' Deliberate Refusal to Clarify**

Documents Plaintiff's repeated pre-litigation efforts to obtain clarification regarding obligations, pricing, inventory, and legal concerns, and Defendants' refusal to respond substantively.

**Exhibit B — MBA's Mandatory, Pre-Filled Opening Order**

Reflects Defendants' requirement that Plaintiff place a mandatory, non-negotiable opening inventory order prior to operation.

**Exhibit C — Attachment to Exhibit B: MBA's Pre-Filled Order Spreadsheet**

Provides the underlying spreadsheet showing opening order quantities, pricing, and suppliers determined in advance by Defendants.

**Exhibit D — Washington State Consent Order and Related Findings**

Government enforcement action documenting regulatory findings concerning Defendants' system and practices.

**Exhibit E — Documented Bait-and-Switch Fraud: Fake Pricing & "Sold Out" Inventory**

Evidence concerning advertised products and pricing that were not genuinely available for sale.

**Exhibit F — Six Patterns of Contradicted Sworn Testimony from Defendant Shoffner**

Side-by-side comparisons of sworn statements against official records.

**Exhibit G — 2009 Ohio Trade Secret Judgment & Conrad's Sworn Admission**

Judicial findings and sworn admissions relating to misappropriation of a business system and Defendant Shoffner's knowledge thereof.

**Exhibit H — Shoffner's Sworn Admission of Knowledge & Financing of Stolen System**

Sworn testimony concerning Defendant Shoffner's financing and benefit from the misappropriated system.

**Exhibit I — Perjury Record: C. Edwin Shoffner (S.D. Ohio Case No. 2:15-cv-02769)**

Court record identifying materially false sworn statements.

**Exhibit J — Deposition of Charles Edwin Shoffner**

Deposition testimony addressing corporate structure, operations, and prior litigation conduct.

**Exhibit K — Litigation and Dealer Termination Tracking Records**

Compiled records reflecting dealer churn, litigation activity, and termination patterns.

**Exhibit L — Arbitrator's Inadequate Disclosures and Concealment of Material Bias**

Documentation concerning disclosure deficiencies in arbitration proceedings.

**Exhibit M — Pre-Opening Enforcement of Exclusive Dealing & Supplier Control**

Evidence of supplier and product restrictions imposed prior to Plaintiff's operation.

**Exhibit N — Bankruptcy Filings and Related Financial Records**

Financial records relevant to insolvency, restructuring, and asset disposition.

**Exhibit O — Records Concerning Service and Evasion Issues**

Documentation relating to service of process and evasive conduct.

**Exhibit P — Court Order Requiring Verified Pleadings**

Judicial order requiring sworn verification due to prior reliability concerns.

**Exhibit Q — Internal Email Communications Concerning Litigation Strategy**

Internal communications addressing litigation coordination and strategy.

**Exhibit R — Prior Judicial Findings Establishing Prima Facie Evidence**

Judicial findings from other proceedings corroborating core factual allegations.

**Exhibit S — Corporate Structure and Shell Entity Documentation**

Records reflecting entity layering and ownership structure.

**Exhibit T — Court Order Confirming Separate Corporate Entities**

Judicial clarification regarding corporate separateness.

**Exhibit U — Historical Territory Agreement Documentation**

Materials concerning territorial representations and enforcement practices.

**Exhibit V — Affidavit of Darren Conrad**

Sworn affidavit addressing misappropriation, knowledge, and operational conduct.

**Exhibit W — Settlement Agreement and Related Filings**

Settlement-related filings from prior judicial proceedings.

**Exhibit X — Coercive Escalation Through Fabricated Jurisdiction**

Evidence concerning escalation of demands and forum pressure through unsupported jurisdictional assertions.

**Exhibit Y — Pre-Contract Text Message Communications**

Text communications exchanged prior to contract execution.

**Exhibit Z — Pre-Contract Email Communications**

Email correspondence preceding contract execution.

**Exhibit AA — Notice of Contract Mailing Dated December 5, 2025**

Proof regarding timing and manner of contract delivery.

**Exhibit BB — Photographs Showing Placement and Concealment of Dealer Agreement Materials**

Photographic documentation concerning placement and accessibility of contract materials.

**Exhibit CC — Communications Concerning Enforcement and Termination**

post-formation communications regarding enforcement actions and termination.

**Exhibit DD — Website Marketing Claims and Product Representations**

Screenshots of public-facing marketing claims and representations.

**Exhibit EE — Court Filings Establishing Personal Jurisdiction in Texas**

Judicial filings and orders confirming Texas personal jurisdiction.

**Exhibit FF — Arbitration Appearance Under Protest Documentation**

Records reflecting Plaintiff's appearance solely to preserve objections.

**Exhibit GG — Evidence of Concealment and Suppression of Fraud**

Documentation concerning suppression of material facts.

**Exhibit HH — Contract Provisions Demonstrating Unconscionable Terms**

Highlighted contractual provisions reflecting extreme imbalance.

**Exhibit II — Formal AAA Challenge to Arbitrator & Institutional Misconduct**

Formal challenge addressing arbitrator bias and institutional conduct.

---

**EXHIBITS**

## APPENDIX A — LIST OF EXHIBITS

Plaintiff incorporates by reference the following exhibits, submitted concurrently with this Amended Complaint and identified as Exhibits A through Z and AA through II, as follows:

- Exhibit A: Plaintiff's Good-Faith Attempt to Resolve & Defendants' Deliberate Refusal to Clarify

- Exhibit B: MBA's Mandatory, Pre-Filled Opening Order

- Exhibit C: Attachment to Exhibit B — MBA's Pre-Filled Order Spreadsheet

- Exhibit D: Washington State Consent Order and Related Findings

- Exhibit E: Documented Bait-and-Switch Fraud — Fake Pricing & "Sold Out" Inventory

- Exhibit F: 6 Patterns of Contradicted Sworn Testimony from Defendant Shoffner

- Exhibit G: 2009 Ohio Trade Secret Judgment and Conrad's Sworn Admission Regarding Shoffner's Knowledge

- Exhibit H: Shoffner's Sworn Admission of Knowledge & Financing of Stolen System

- Exhibit I: Perjury Record: C. Edwin Shoffner (Retail Service Systems, Inc. v. Mattress By Appointment, LLC et al., S.D. Ohio Case No. 2:15-cv-02769)

- Exhibit J: Deposition of Charles Edwin Shoffner

- Exhibit K: Litigation and Dealer Termination Tracking Records

- Exhibit L: Arbitrator's Inadequate Disclosures and Concealment of Material Bias

- Exhibit M: Pre-Opening Enforcement of Exclusive Dealing and Supplier Control

- Exhibit N: Bankruptcy Filings and Related Financial Records

- Exhibit O: Records Concerning Service and Evasion Issues

- Exhibit P: Court Order Requiring Verified Pleadings

- Exhibit Q: Internal Email Communications Concerning Litigation Strategy

- Exhibit R: Prior Judicial Findings Establishing Prima Facie Evidence

- Exhibit S: Corporate Structure and Shell Entity Documentation

- Exhibit T: Court Order Confirming Separate Corporate Entities

- Exhibit U: Historical Territory Agreement Documentation

- Exhibit V: Affidavit of Darren Conrad

- Exhibit W: Settlement Agreement and Related Filings

- Exhibit X: Coercive Escalation Through Fabricated Jurisdiction

- Exhibit Y: Pre-Contract Text Message Communications with Defendant's Agents

- Exhibit Z: Pre-Contract Email Communications

- Exhibit AA: Notice of Contract Mailing Dated December 5, 2025

- Exhibit BB: Photographs Showing Placement and Concealment of Dealer Agreement Materials

- Exhibit CC: Communications from Defendant's Agent Concerning Enforcement and Termination

- Exhibit DD: Screenshots of Website Marketing Claims and Product Representations

- Exhibit EE: Court Filings and Orders Establishing Personal Jurisdiction in Texas

- Exhibit FF: Arbitration Appearance Under Protest Documentation

- Exhibit GG: Evidence Relating to Concealment and Suppression of Alleged Fraud

- Exhibit HH: Contract Provisions Demonstrating Unconscionable Terms and the Necessity of Concealment

- Exhibit II: Formal AAA Challenge to Arbitrator William F. Adams, Jr. and Institutional Misconduct

---

### INCORPORATION BY REFERENCE

Each exhibit is incorporated herein by reference as though fully set forth and is submitted in support of Plaintiff's factual allegations, jurisdictional assertions, and claims for relief.